JARDIM, MEISNER & SUSSER, P.C.
Richard S. Meisner, Esq.
420 Lexington Avenue, Suite 300-19
New York, NY 10170
Tel:     (973) 845-7640
Attorneys for Plaintiff, Eugene Mason

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EUGENE MASON, | |
| Plaintiff, | Civil Action No.: |
| v. | VERIFIED COMPLAINT |
| AMTRUST FINANCIAL SERVICES, INC. and DAVID LEWIS, | |
| Defendants. | |

Plaintiff, Eugene Mason ("Plaintiff" or "Mason"), by and through its attorneys, Jardim, Meisner & Susser, P.C., hereby files this Verified Complaint for damages against AmTrust Financial Services, Inc. ("AmTrust"), and David Lewis ("Lewis"), and states as follows:

### THE PARTIES

1.    Eugene Mason is a citizen of the United States of America who resides in the State of Connecticut. Mason was, at all times referenced in the Verified Complaint unless explicitly stated otherwise, an employee of AmTrust.

2.    AmTrust Financial Services, Inc. is a corporation organized under the laws of the State of Delaware with a principal address of 59 Maiden Lane, 43rd Floor, New York, New York 10038. AmTrust trades on the NASDAQ Stock Market under the ticker symbol, "AFSI."

3.    David Lewis is a citizen of the United States of America who resides in the State of Massachusetts. Lewis was, at all times referenced in the Verified Complaint unless explicitly

stated otherwise, an employee of AmTrust.

## JURISDICTION AND VENUE

4.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 based upon a federal question arising under the U.S. Defend Trade Secrets Act.

5.   This Court also has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a) because it involves a dispute between citizens of different States and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

6.   Plaintiff Mason is a citizen of the State of Connecticut, Defendant AmTrust is a citizen of the State of Delaware, and Defendant Lewis is a citizen of the State of Massachusetts.

7.   AmTrust conducts business in New York by providing a variety of insurance policies and coverages to individuals, businesses, and various other clients.

8.   Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(2) because AmTrust maintains its principal address in New York, New York, and violated the U.S. Defend Trade Secrets Act in this District.

9.   Venue and jurisdiction are, therefore, appropriate in this District.

## BACKGROUND FACTS

10. Between 1998 and 2010, Mason, alone, collected significant data and shortly thereafter developed a proprietary pricing tool that could be used by insurance carriers to value professional liability insurance for different classes of individuals (e.g., lawyers, real estate professionals, financial services professionals, etc.) (the "**Mason Proprietary Pricing Tool**").

11. The Mason Proprietary Pricing Tool uses information from primary carrier professional lines portfolio information, including premium and loss data, and third-party vendor information (for example, information relating to the American Bar Association that is

applicable to the pricing of insurance products that protect attorneys) that was obtained by Mason, alone, individually, and lawfully.

12. Mason combined this information with actuarial analysis, which melded the information into one pricing tool as opposed to an individual tool for each class, and thus creating a superior and extremely valuable product.

13. At all times, the Mason Proprietary Pricing Tool was designed, developed, and updated by Mason. At all times, Mason was, and remains, the sole and exclusive owner of the Mason Proprietary Pricing Tool. At no time, ever, did Mason sell or assign his sole and exclusive rights in and to the Mason Proprietary Pricing Tool to AmTrust or any other party.

14. Upon information and belief, AmTrust had no comparable pricing tool prior to its hiring Mason.

15. Furthermore, upon information and belief, developing a similar pricing tool would take years and cost AmTrust substantial amounts of money.

16. Mason commenced employment with AmTrust on or about September 27, 2013.

17. The terms of Mason's employment were memorialized in a written agreement entitled "Offer of Employment" dated September 26, 2013 (the "Employment Agreement").

18. The employment agreement provided that Mason would be paid bonus compensation equal to three percent (3%) of "Net Underwriting Income" (the "Underwriting Bonus").

19. During all relevant periods of employment, the Company failed to pay (or substantially underpaid), the Underwriting Bonus.

20. The Company breached the Employment Agreement by failing to pay the Underwriting Bonus.

21. When Mason was hired by AmTrust as a Senior Vice President, Professional Liability,

he was hired with the explicit understanding (by both Mason and senior executives at AmTrust, including both David Lewis and Barry Zyskind, the Chairman of the AmTrust Board of Directors, among others) that he would use and license his Mason Proprietary Pricing Tool to AmTrust, for their joint use during his employment tenure with the company. However, the parties understood that the Mason Proprietary Pricing Tool would remain Mason's personal property, and that AmTrust would not acquire any rights in and to the tool, or any other rights, except as may be granted by Mason at his discretion and from time to time under a limited licensing arrangement during and subject to the term of Mason's employment.

22. For all relevant time periods, AmTrust maintained a computer system for the electronic storage of all of its owned, licensed or proprietary software, referred to as ANA 2.0, 3.0.

23. However, for all relevant time periods, the Mason Proprietary Pricing Tool was kept off of AmTrust's ANA system, and maintained separately at the direction of Mason.  This was intentional and intended to safeguard Mason's ownership of the tool.

24. Apart from licensing it to AmTrust, Mason did not share his pricing tool with anyone else.

25. The Mason Proprietary Pricing Tool was kept secret, and was a trade secret.

26. Company policy regarding software and technology would have required the Company to host the Mason Proprietary Pricing Tool on its own systems, but the Company did not do this because the tool was the property of Mason.

27. On October 13, 2013, shortly after he was hired, Mason e-mailed the Mason Proprietary Pricing Tool to Lewis, to his soon-to-become manager at AmTrust, from his personal e-mail account. Again, Mason did so with the understanding that the tool was and would remain his sole and exclusive property and that AmTrust was licensing it from him on

a limited and discretionary basis during the term of employment. Lewis received and accepted the tool and delivered it to AmTrust and AmTrust then integrated it into its business operations.

28. For the next six years, Mason and AmTrust continued to use the pricing tool in interstate commerce without issue. During this time, Mason continued to develop it further in his spare time.

29. In 2016, AmTrust sent Mason a document requesting that he sign over the rights to the Mason Proprietary Pricing Tool (along with any other intellectual property), which Mason explicitly refused to do. After Mason refused to sign the agreement, he was pressed by the company's lawyers and human resources to do so anyway. When Mason continued to refuse to sign it, Lewis privately acknowledged to Mason that he understood why he wouldn't give away his rights in the Mason Proprietary Pricing Tool. After that, AmTrust dropped the matter.

30. On July 17, 2019, Mason was abruptly terminated from his position with AmTrust. AmTrust through its officers then lied to Mason about the reason and basis for his termination.

31. Shortly thereafter, on July 19, 2019, Mason through counsel sent AmTrust a cease and desist letter demanding that AmTrust immediately stop using the Mason Proprietary Pricing Tool.

32. On July 24, 2019, AmTrust responded to Mason's letter, which denied being in possession of what it considered "proprietary information" or "trade secrets" owned by Mason but did not deny its use (or continued use) of the Mason Proprietary Pricing Tool.

33. The Mason Proprietary Pricing Tool has substantial value. Upon information and belief, AmTrust continues to use and disseminate the tool to his detriment and is generating revenues and profits by using the tool without Mason's consent, depriving Mason of the possession and dominion of his personal property of which he is the sole and exclusive owner.

34. Indeed, every additional employee that gains access to the tool, and every insurance policy that is underwritten using information contained in the tool or analyzed through it, damages Mason.

## COUNT I

### MISAPPROPRIATION OF TRADE SECRETS, DEFEND TRADE SECRETS ACT 18 U.S.C. §§ 1831-1839

35. Plaintiff repeats and realleges every allegation contained in the preceding paragraphs by reference as though fully set forth herein.

36. The Mason Proprietary Pricing Tool, comprising of raw data accumulated by Plaintiff combined with proprietary actuarial analysis and algorithmic calculation, are trade secrets subject to protection under the Defend Trade Secrets Act, 18 U.S.C. §§ 1832, 1836.

37. The aforementioned information is a compilation of information that derives independent economic value by not being generally known to or accessible, through proper means, to competitors, such as AmTrust, who can profit from its explicit and/or implicit and/or intentional and/or inevitable use or disclosure.

38. This information is related to a product or service used in or intended for use in interstate commerce.

39. Plaintiff has taken reasonable measures under the circumstances to maintain the secrecy of this information.

40. AmTrust was privy to this information solely as a result of their promise and implied license to use the tool at Plaintiff's discretion, maintain its secrecy, to keep the information confidential, and to only use it for the benefit of AmTrust at Plaintiff's discretion.

41. By continuing to use the pricing tool despite Plaintiff's revocation of the license,

AmTrust and Lewis are knowingly stealing, or without authorization appropriating, taking, and carrying away such information.

42. AmTrust and Lewis are engaged in this conduct intending or knowing that it will injure Plaintiff, the owner of the trade secrets at issue.

43. The foregoing conduct of AmTrust and Lewis constitutes a misappropriation and misuse of Plaintiff's confidential, trade secret information.

44. The Defend Trade Secrets Act provides that any organization that commits an offense under the Act "shall be fined not more than the greater of $5,000,000 or 3 times the value of the stolen trade secret to the organization." 18 U.S.C. § 1832(b).

45. AmTrust and Lewis acted willfully and maliciously in misappropriating Plaintiff's confidential, trade secret information for their own benefit and to the intended detriment of Plaintiff.

46. As a consequence of the foregoing, Plaintiff has suffered and will continue to suffer economic losses, including but not limited to, lost business, as well as irreparable harm and loss of goodwill, and Plaintiff is entitled to compensatory damages in an amount yet to be determined pursuant to 18 U.S.C. § 1836(b)(3)(B), exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C), attorney's fees, expenses, and costs pursuant to 18 U.S.C. § 1836(b)(3)(D), and such other legal or equitable relief that this Court deems just and proper.

COUNT II

MISAPPROPRIATION OF TRADE SECRETS AND
CONFIDENTIAL INFORMATION
UNDER NEW YORK COMMON LAW

47. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs by reference as though fully set forth herein.

48. Plaintiff has a protectable trade secret in the confidential customer information it keeps,

7

including its client names, contact information, and customer data.

49. Plaintiff derives economic value and a competitive advantage from this trade secret due to it not being generally known to other persons who could obtain economic value form its disclosure or use.

50. Plaintiff has made efforts that are reasonable under the circumstances to maintain the secrecy of such information.

51. In breach of the implied license, Defendants have used Plaintiff's trade secret to unfairly compete with Plaintiff.

52. Defendants have used Plaintiff's trade secret information in bad faith for their own benefit and to the detriment of Plaintiff.

53. Defendants' use and misappropriation of Plaintiff's trade secret information constitutes a misappropriation of trade secrets in violation of New York common law.

54. As a consequence of the foregoing, Plaintiff has suffered and will continue to suffer economic losses, including but not limited to, lost business, as well as irreparable harm and loss of goodwill, and is entitled to compensatory damages as well as punitive damages, and such other legal or equitable relief that this Court deems just and proper.

<u>COUNT III</u>

UNJUST ENRICHMENT

55. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs by reference as though fully set forth herein.

56. Plaintiff is entitled to compensation in an amount to be proven at trial and punitive damages as a result of Defendants' unauthorized use and conversion of Plaintiff's confidential business information, trade secrets, and business opportunities.

57. Upon information and belief, Defendants have been enriched as a result of the Defendants' misappropriation, conversion, and unauthorized use of Plaintiff's confidential business information, trade secrets, and business opportunities to benefit Defendants and harm Plaintiff.

58. The retention of the amount by which Defendants have been enriched as a result of AmTrust's and Lewis' unlawful conduct as alleged herein, is contrary to the principles of fairness, justice, and equity.

59. Plaintiff is entitled to recover from Defendants the amount by which Defendants have been enriched as a result of their unlawful conduct as alleged in the Verified Complaint

60. Plaintiff is entitled to recover from Defendants the amount by which Defendants have been enriched as a result of their unlawful conduct as alleged in the Verified Complaint.

COUNT IV

BREACH OF IMPLIED LICENSE

61. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs by reference as though fully set forth herein.

62. Plaintiff permitted Defendant to use the Mason Proprietary Pricing Tool under an implied license.

63. The implied license was duly formed and understood by the parties.

64. The implied license was granted to AmTrust as a condition of Plaintiff's continuing employment with AmTrust.

65. AmTrust terminated Plaintiff's employment.

66. The implied license granted by Plaintiff to Defendant terminated upon the termination of Plaintiff's employment.

67. Plaintiff is entitled to recover from Defendants the amount by which Defendants have been enriched as a result of their unlawful use of the Mason Proprietary Pricing Tool following the termination of the implied license.

COUNT V

BREACH OF CONTRACT PERTAINING TO EMPLOYMENT COMPENSATION

68. Plaintiff is entitled to be paid compensation referred to as Underwriting Bonuses, as set forth in the Employment Agreement.

69. The Employment Agreement is a valid, binding and enforceable agreement between Mason and the Company.

70. The Company breached the Employment Agreement by failing to pay the Underwriting Bonuses.

71. Plaintiff is entitled to recover from the Company the entirety of the Underwriting Bonuses.

**PRAYER FOR RELIEF**

**WHEREFORE**, Mason respectfully requests that this Court enter judgment in its favor, and against Defendants AmTrust and Lewis on all counts, and award him the following relief:

a) Monetary damages against Defendants jointly and severally, through compensatory damages, actual losses, and disgorgement of Defendants' ill-gotten profits;

b) Exemplary and punitive damages as a result of Defendants' willful, intentional, and malicious conduct;

c) Treble damages;

d) Reasonable attorney's fees, including interest and costs incurred in this action; and

e) Equitable relief in the form of declaratory judgment that the Mason Proprietary Pricing

10

Tool is the sole property of Mason;

f)   Equitable relief in the form of an injunction and constructive trust in favor of Mason; and

g)   All such other and further relief and remedies as this Court deems just and proper and as are justified by the evidence presented at trial in this proceeding.


Respectfully submitted,

Dated: September 9, 2019                          **JARDIM, MEISNER & SUSSER, P.C.**

                                                    _____

                                                    Richard S. Meisner, Esq.