JARDIM, MEISNER & SUSSER, P.C.
Richard S. Meisner, Esq.
Richard A. Catalina, Jr, Esq. (pro hac vice admission pending)
420 Lexington Avenue, Suite 300-19
New York, NY 10170
Tel:    (973) 845-7640
Attorneys for Plaintiff, Eugene Mason

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EUGENE MASON,<br><br>         Plaintiff,<br><br>    v.<br><br>AMTRUST FINANCIAL SERVICES, INC. and DAVID LEWIS,<br><br>         Defendants. | Civil Action No.: 19-CV-8364 (DLC)<br><br>AMENDED<br>VERIFIED COMPLAINT |

Plaintiff, Eugene Mason ("Plaintiff" or "Mason"), by and through its attorneys, Jardim, Meisner & Susser, P.C., hereby files this Amended Verified Complaint for monetary damages and equitable relief against defendants AmTrust Financial Services, Inc. ("AmTrust"), and David Lewis ("Lewis") (collectively, AmTrust and Lewis referred to herein as "Defendants") (collectively, Mason and Defendants, the "Parties"), and states as follows:

### NATURE OF THE SUIT

1.    Mason brings this action against Defendants as a result of their brazen and improper misappropriation of a unique, novel and highly sophisticated software pricing tool developed solely, exclusively and lawfully by Mason over a 15-year period of which he is the sole and exclusive owner (defined further within this Amended Verified Complaint as the "Mason

Proprietary Pricing Tool" or, simply, the "Tool").  Mason expended thousands of hours between 1998-2010 developing the Mason Proprietary Pricing Tool, compiling thousands of pieces of data; creating and developing product and sub line information and analysis, combined with actuarial supported formulations, algorithms, calculations and analytical methods and processes; investing and applying his own intellectual capital from more than thirty (30) years of extensive experience in the insurance industry of pricing and underwriting professional liability business to create a complex software program worth millions of dollars.

2.      As described in greater detail herein, when Mason commenced employment with AmTrust on or about September 27, 2013, part and parcel of that arrangement was that while Mason would allow AmTrust underwriting employees on Mason's team to use the Mason Proprietary Pricing Tool as part of their underwriting activities, it was only pursuant to a license conditioned on Mason's employment with AmTrust and AmTrust complying with its obligations to Mason under the terms and conditions of his employment.

3.      Moreover, prior to AmTrust hiring Mason, it was agreed upon by the Parties that the Mason Proprietary Pricing Tool would remain the sole and exclusive property of Mason.

4.      Subsequently, in or about 2016, AmTrust seemingly reversed course, pressing Mason to execute a transfer of rights document that would convey and transfer ownership of the Tool to AmTrust.  Mason rightly refused.  AmTrust thereafter continued to pressure and threaten Mason to sign over the Tool, but Mason, rightly, refused to transfer the Mason Proprietary Pricing Tool to AmTrust in order to maintain his ownership rights and interests in and to his personal and proprietary property.

5.      As a result, AmTrust retaliated against Mason by withholding his profit-sharing bonus – despite the fact that Mason, using the Mason Proprietary Pricing Tool and working with

his underwriting team, produced $167,000,000 in gross written premiums ("GWP") for AmTrust through year end 2018.

6.   AmTrust further retaliated against Mason for his rightful and lawful efforts to protect his ownership rights and interests in his proprietary property by terminating him in 2019.

7.   Despite post-termination efforts to enforce the terms and conditions of his employment arrangement with AmTrust, including Mason's licensing arrangement with AmTrust as to illegal and unlawful continued use by AmTrust of the Tool after Mason's termination, including demands that AmTrust cease and desist all use of the Mason Proprietary Pricing Tool and returning all copies of same to Mason, AmTrust has refused in all respects.  AmTrust has stolen from Mason the Mason Proprietary Pricing Tool and deprived Mason of the sole and exclusive use and benefit of his sole and exclusive property.

8.   Mason now brings this action against AmTrust and Lewis for actual and punitive monetary damages resulting from their blatant theft of his property and for injunctive, equitable relief to prevent the Defendants from continuing to use what clearly belongs exclusively to Mason.

### THE PARTIES

9.   Plaintiff Eugene Mason is a citizen of the United States of America who resides in the State of Connecticut.  Mason was, at all times referenced in the Verified Complaint unless explicitly stated otherwise, an employee of AmTrust.

10.   Defendant AmTrust Financial Services, Inc. is a corporation organized under the laws of the State of Delaware with a principal address of 59 Maiden Lane, 43rd Floor, New York, New York 10038.  AmTrust trades on the NASDAQ Stock Market under the ticker symbol, "AFSI."

11.   Defendant David Lewis is a citizen of the United States of America who resides in the State of Massachusetts.  Lewis was, at all times referenced in the Verified Complaint unless

explicitly stated otherwise, an employee of AmTrust.

## JURISDICTION AND VENUE

12.   This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 based upon a federal question arising under the U.S. Defend Trade Secrets Act.

13.   This Court also has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. §1332(a) because it involves a dispute between citizens of different States and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

14.   Plaintiff Mason is a citizen of the State of Connecticut, Defendant AmTrust is a citizen of the State of Delaware, and Defendant Lewis is a citizen of the State of Massachusetts.

15.   AmTrust conducts business in New York by providing a variety of insurance policies and coverages to individuals, businesses, and various other clients.

16.   Venue in this Court is proper pursuant to 28 U.S.C. §1391(b)(2) because AmTrust maintains its principal address in New York, New York, and violated the U.S. Defend Trade Secrets Act in this District.

17.   Venue and jurisdiction are, therefore, appropriate in this District.

## FACTS GIVING RISE TO PLAINTIFF'S CAUSES OF ACTION

### A.   Development of the Mason Proprietary Pricing Tool

18.   Between 1998 and 2010, prior to his employment with AmTrust, and acting alone, individually and lawfully, Mason expended thousands of hours collecting, compiling and analyzing extraordinarily vast amounts of data relating to the pricing of professional liability insurance for various classes and sub lines of professional service firms (*e.g.*, lawyers, real estate professionals, financial services professionals, etc.).

19.   During this same time period, and prior to his employment with AmTrust, Mason, in

his sole and exclusive capacity, compiled the collected data in a comprehensive, complex, multi-tabbed spreadsheet.  Mason further created and developed, in his sole and exclusive capacity and based on his extensive knowledge and experience in the industry, with actuarial supported formulations, algorithms, calculations and analytical methods and processes to analyze and process the compiled data using thousands of input variables that effectively, accurately and consistently produced data outputs that valued professional liability insurance premiums for the different classes of professional service insureds.

20.   As such, Mason, in his sole and exclusive capacity, after expending thousands of hours of time and effort over the years– and prior to his employment with AmTrust, created and developed the Mason Proprietary Pricing Tool – a highly valuable, unique and proprietary software pricing tool for valuing professional liability individual risk business for many different classes of professional service insureds.  The Mason Proprietary Pricing Tool afforded AmTrust ease of entry into the market without having to spend hundreds of thousands of dollars researching and developing their own pricing model and provides a competitive advantage over other carriers who don't have a similar tool that underwriters can rely upon to ensure consistent approach to pricing accounts.  Further, in an industry that relies on adequate pricing for profitability, the Tool is ever more significant in that it is based upon multiple carrier information collected and compiled over a 12-year period.

21.   The Mason Proprietary Pricing Tool is a complex software program utilizing Microsoft Excel® as its operational platform.  Nonetheless, all data was collected and compiled solely and exclusively by Mason, and the formulations, programming, calculations, algorithms and modules used by and incorporated within the Mason Proprietary Pricing Tool were developed with actuarial support and entered into the Tool by Mason or at his direction – all prior to his

employment with AmTrust.

22.   The Mason Proprietary Pricing Tool is a superior and extremely valuable intellectual and proprietary property of which Mason is the sole and exclusive owner.

### B.   The Mason Proprietary Pricing Tool – Sample Features and Modules

23.   Although the Mason Proprietary Pricing Tool is built on Microsoft Excel® and uses that framework as its underlying operational platform, the Tool is anything but a "generic" spreadsheet.  For example, in its current state, the software Tool comprises a total of 19 modules (each module comprising a separate spreadsheet tab), all of which may be hidden/unhidden and many of which constitute "pivot tables" – data entered in one module is processed therein via algorithms and formulas and the output thereof is directed towards input cells in other connected modules and processed therein according to the second module's algorithms and formulas.

24.   The Mason Proprietary Pricing Tool is directed towards pricing professional liability insurance for different professional liability classes of individuals under which hundreds of variable inputs and assumptions may be modified by the underwriter/ users to obtain premium pricing in accordance with those assumptions and based on the algorithms and formulas created and programmed in the Tool.

25.   The Mason Proprietary Pricing Tool was designed by Mason for use by underwriters as a systematic, measurable and consistent approach to pricing professional firms on an individual risk basis.  The Tool was also designed with efficiency in mind.  The objective of Mason's software is to provide a professional liability underwriter with the ability to enter basic account information/inputs (for example, as discussed below, in various modules, such as a Summary Output Input module, Exposure module, State module, Cyber module, etc.) that would further provide a streamlined approach for developing pricing for individual professional service firms.

The Tool was also designed by Mason to serve as a means for capturing account information (*e.g.*, in a Data Collection module) that may then be compiled on a portfolio basis and used by corporate actuaries to update experience rating in the future by professional liability class of business.

26.   The Mason Proprietary Pricing Tool incorporates information and data compiled by Mason for ten (10) different professional products: Lawyers, Accountants, Insurance Services, Real Estate, Miscellaneous Licensed Professionals, Financial Services, Broker Dealers, A&E (architects and engineers), Public Entity, Cyber Liability, and Allied Health related professional firms.  Each risk has dedicated exposure criteria all developed solely and exclusively by Mason from his product knowledge and expertise.

27.   While the Mason Proprietary Pricing Tool may be utilized to provide pricing for ten (10) different professional products, the Tool is so sophisticated that it may be utilized to price professional liability insurance for 131 classes of professionals.  Such pricing is specifically based on the data collected by Mason when building the Tool and his 30-years of experience in the industry.

28.   The 131 classes/sub lines of professional services currently built into the Tool by Mason include the following:

| NO. | CLASS | INDUSTRY | BASE RATE RELATIVITY | SEVERITY RELATIVITY |
|-----|-------|----------|----------------------|---------------------|
| 1 | Architects | A&E | 1.0000 | 1.0000 |
| 2 | Civil | A&E | 1.2500 | 1.2500 |
| 3 | Construction Managers Agency | A&E | 1.0000 | 1.0000 |
| 4 | Construction Managers At Risk | A&E | 1.2500 | 1.2500 |
| 5 | Design Only Services | A&E | 1.0000 | 1.0000 |
| 6 | Electrical Engineer | A&E | 0.8000 | 0.8000 |
| 7 | Environmental | A&E | 0.8000 | 1.2500 |
| 8 | Geotech | A&E | 1.2500 | 1.2500 |
| 9 | HVAC Engineer | A&E | 1.2500 | 1.2500 |

| 10 | Interior Design | A&E | 0.8000 | 0.8000 |
| 11 | Land Surveyor | A&E | 1.0000 | 1.0000 |
| 12 | Landscape Architect | A&E | 0.8000 | 0.8000 |
| 13 | Mechanical Engineer | A&E | 0.8000 | 0.8000 |
| 14 | Other | A&E | 1.0000 | 1.0000 |
| 15 | Process Engineer | A&E | 1.2500 | 1.2500 |
| 16 | Structural | A&E | 1.0000 | 1.2500 |
| 17 | Telecommunication Engineer | A&E | 1.2500 | 1.2500 |
| 18 | Traffic Engineering | A&E | 1.2500 | 1.2500 |
| 19 | Actuary | Accountants | 1.5000 | 1.5000 |
| 20 | Attest Services | Accountants | 1.2500 | 1.2500 |
| 21 | Basic Services | Accountants | 0.8000 | 0.8000 |
| 22 | Consulting Services | Accountants | 1.2500 | 1.2500 |
| 23 | Other | Accountants | 1.0000 | 1.0000 |
| 24 | Special Services | Accountants | 1.2500 | 1.2500 |
| 25 | Tax | Accountants | 1.2500 | 1.2500 |
| 26 | Clinical Research | Allied Health | 1.2500 | 1.2500 |
| 27 | Managed Care | Allied Health | 1.2500 | 1.2500 |
| 28 | Medical Testing Facility/Lab | Allied Health | 1.0000 | 1.0000 |
| 29 | Other | Allied Health | 0.8000 | 0.8000 |
| 30 | Outpatient Clinic | Allied Health | 1.5000 | 1.5000 |
| 31 | Financial Planner or Consultant | Financial Products | 0.8000 | 0.8000 |
| 32 | Investment Advisor | Financial Products | 1.0000 | 1.0000 |
| 33 | Investment Banker or Fund Manager | Financial Products | 1.2500 | 1.5000 |
| 34 | Mergers & Acquisitions | Financial Products | 1.0000 | 1.2500 |
| 35 | Other | Financial Products | 1.0000 | 1.2500 |
| 36 | Securities Broker or Dealer | Financial Products | 1.2500 | 1.2500 |
| 37 | Agents and Brokers | Insurance Products | 1.0000 | 1.0000 |
| 38 | Claims Adjuster | Insurance Products | 1.0000 | 0.8000 |
| 39 | Insurance Company | Insurance Products | 1.0000 | 1.2500 |
| 40 | Life Settlement | Insurance Products | 1.2500 | 1.2500 |
| 41 | MGA/MGU | Insurance Products | 1.2500 | 1.2500 |
| 42 | Other | Insurance Products | 1.0000 | 1.0000 |
| 43 | Reinsurance Intermediary | Insurance Products | 0.8000 | 1.5000 |
| 44 | Risk Manager/Loss Control | Insurance Products | 0.8000 | 1.2500 |
| 45 | Specialty Products | Insurance Products | 1.0000 | 1.2500 |

| 46 | TPA | Insurance Products | 1.2500 | 1.0000 |
|----|-----|--------------------|--------|--------|
| 47 | Viaticals | Insurance Products | 0.8000 | 1.2500 |
| 48 | Administrative and Government law | Lawyers | 0.6667 | 0.6667 |
| 49 | Admiralty/Maritime | Lawyers | 1.0000 | 1.0000 |
| 50 | Antitrust and Trade Regulation | Lawyers | 1.0000 | 1.0000 |
| 51 | Arbitration/Mediation | Lawyers | 0.6667 | 0.8000 |
| 52 | Banking | Lawyers | 1.2500 | 1.2500 |
| 53 | Bankruptcy | Lawyers | 0.8000 | 1.2500 |
| 54 | Civil Rights and Discrimination | Lawyers | 0.8000 | 0.8000 |
| 55 | Collections | Lawyers | 1.0000 | 1.0000 |
| 56 | Communications (FCC) | Lawyers | 0.8000 | 0.8000 |
| 57 | Corporate Partnership and Business Law | Lawyers | 1.0000 | 1.0000 |
| 58 | Criminal Law | Lawyers | 1.0000 | 1.0000 |
| 59 | Debt Collection and Repossession | Lawyers | 1.2500 | 1.0000 |
| 60 | Divorce, Custody and Family Law | Lawyers | 1.0000 | 1.0000 |
| 61 | Entertainment | Lawyers | 0.8000 | 1.2500 |
| 62 | Environmental Law | Lawyers | 1.0000 | 1.0000 |
| 63 | Immigration and Naturalization | Lawyers | 1.0000 | 1.0000 |
| 64 | Intellectual Property including Patent, Trademark and Copyright law | Lawyers | 1.2500 | 1.5000 |
| 65 | Labor, Pension and Employee Benefits | Lawyers | 1.2500 | 1.0000 |
| 66 | Malpractice and Negligence Law | Lawyers | 1.2500 | 1.2500 |
| 67 | Mergers and Acquisitions | Lawyers | 1.2500 | 1.2500 |
| 68 | Other | Lawyers | 1.0000 | 1.0000 |
| 69 | Personal Injury & Civil Litigation | Lawyers | 1.2500 | 1.0000 |
| 70 | Product Liability law | Lawyers | 1.2500 | 1.2500 |
| 71 | Public Contract Law | Lawyers | 1.0000 | 1.0000 |
| 72 | Real estate law | Lawyers | 1.2500 | 1.0000 |
| 73 | Securities Law | Lawyers | 1.0000 | 1.5000 |
| 74 | Taxation Law | Lawyers | 1.0000 | 1.0000 |
| 75 | Traffic Violations | Lawyers | 1.0000 | 0.8000 |
| 76 | Wills, estate, trust and probate | Lawyers | 1.0000 | 1.0000 |
| 77 | Workers' Compensation – Plaintiff | Lawyers | 1.2500 | 1.0000 |
| 78 | Auctioneer (not Real Estate) | Misc. | 0.6667 | 0.6667 |
| 79 | Beautician | Misc. | 0.8000 | 0.8000 |
| 80 | E-Commerce | Misc. | 1.0000 | 1.0000 |

| 81 | Franchisors | Misc. | 1.0000 | 1.0000 |
|---|---|---|---|---|
| 82 | Marine | Misc. | 1.2500 | 1.2500 |
| 83 | Media | Misc. | 1.0000 | 1.0000 |
| 84 | Miscellaneous Consultants | Misc. | 1.0000 | 1.0000 |
| 85 | Other | Misc. | 1.0000 | 1.0000 |
| 86 | Promoter/Promotions | Misc. | 1.0000 | 1.0000 |
| 87 | Social Services | Misc. | 1.0000 | 1.0000 |
| 88 | Specialty Services | Misc. | 1.0000 | 1.0000 |
| 89 | Staffing / Placement Agency | Misc. | 1.2500 | 1.2500 |
| 90 | Trustee | Misc. | 1.0000 | 1.0000 |
| 91 | Other | Other | 1.0000 | 1.0000 |
| 92 | Educational Institution | Public Entities | 1.2500 | 1.0000 |
| 93 | Housing Authority | Public Entities | 1.0000 | 1.0000 |
| 94 | Other | Public Entities | 1.0000 | 1.0000 |
| 95 | Police and Fire Departments | Public Entities | 1.2500 | 1.0000 |
| 96 | Town, County, or City | Public Entities | 1.2500 | 0.8000 |
| 97 | Transportation Authority | Public Entities | 1.0000 | 1.0000 |
| 98 | Utility, Water, Sewage, or Electric Authority | Public Entities | 0.8000 | 0.8000 |
| 99 | Zoning Board or Development Authority | Public Entities | 1.0000 | 1.0000 |
| 100 | Abstractor | Real Estate | 1.2500 | 1.2500 |
| 101 | Appraiser | Real Estate | 1.2500 | 1.0000 |
| 102 | Auctioneer (Real Estate) | Real Estate | 0.8000 | 0.8000 |
| 103 | Commercial Agent/Broker | Real Estate | 1.0000 | 1.0000 |
| 104 | Commercial Property Manager | Real Estate | 1.2500 | 1.2500 |
| 105 | Developer | Real Estate | 1.2500 | 1.2500 |
| 106 | Escrow Agent | Real Estate | 1.0000 | 1.0000 |
| 107 | Loan Origination | Real Estate | 1.2500 | 1.2500 |
| 108 | Loan Servicing | Real Estate | 1.0000 | 1.0000 |
| 109 | Mortgage Banker | Real Estate | 1.2500 | 1.2500 |
| 110 | Mortgage Dealer/Broker | Real Estate | 1.2500 | 1.2500 |
| 111 | Other | Real Estate | 1.0000 | 1.0000 |
| 112 | Residential Agent/Broker | Real Estate | 1.2500 | 1.0000 |
| 113 | Residential Property Manager | Real Estate | 1.0000 | 1.0000 |
| 114 | Title Agent | Real Estate | 1.2500 | 1.0000 |
| 115 | Application Service Providers (ASPs) | Technology | 1.2500 | 1.0000 |
| 116 | Data Processing | Technology | 0.8000 | 0.8000 |

| 117 | Diversified Technology | Technology | 1.0000 | 1.0000 |
| 118 | Hardware and Component Manufacturing | Technology | 0.8000 | 0.8000 |
| 119 | Helpdesk Services | Technology | 0.6667 | 0.6667 |
| 120 | Internet Service Providers | Technology | 1.2500 | 1.0000 |
| 121 | Managed Service Providers | Technology | 1.0000 | 1.2500 |
| 122 | Online Marketing and Advertising | Technology | 1.2500 | 1.2500 |
| 123 | Online Media Services (Broadcasting) | Technology | 1.0000 | 0.8000 |
| 124 | Other | Technology | 1.0000 | 1.0000 |
| 125 | Search Engine Optimization | Technology | 1.2500 | 1.2500 |
| 126 | Social Networking/Online Content | Technology | 1.5000 | 1.2500 |
| 127 | Software Design/Development | Technology | 1.0000 | 0.8000 |
| 128 | Software Game Development | Technology | 1.2500 | 1.2500 |
| 129 | Technology Consulting | Technology | 1.0000 | 1.0000 |
| 130 | Value Added Resellers | Technology | 0.6667 | 0.6667 |
| 131 | Website Development/Hosting | Technology | 0.8000 | 0.8000 |

29.     Each of the above classes and subclasses of professionals is tied to specific pivot modules and compiled data, as well as other data input variables and factors.  In addition, each class of professional is assigned specific Increase Limit Factor ("ILF") values and Limited Expected Value ("LEV") for base rate relativity and severity factors, as compiled and applied by Mason prior to his employment with AmTrust from various public and non-public sources and adjusted by Mason based on his knowledge, experience and expertise.

30.     An example of the complexity and sophistication of the Mason Proprietary Pricing Tool is the software's "Data Capture" module.  The Data Capture module alone comprises approximately 273 columns of data inputs which are applied accordingly to the specific class of professional.  The Data Capture module further includes up to 255 inputs per risk. Again, the data capturing capability affords the ability to aggregate and roll up data for future tool modifications by all the various inputs and outputs.

31.     Another example of the complexity and sophistication of the Mason Proprietary

Pricing Tool is the software's "Summary Input Output" module. The Summary Input Output module is essentially the "brain center" of the Mason Proprietary Pricing Tool wherein underwriters focus most of their attention. The Summary Input Output module comprises most of the Tool's inputs and outputs and into which various data from the Tool's other pivot modules feed. In addition to the actuarial supported calculation/formula/algorithmic portions, the Summary Input Output module comprises a plethora of drop-down menus created solely and exclusively by Mason that require underwriting selection.

32.    The Summary Input Output module captures and pulls ILFs and claim count reporting patterns by class and sub class of business, as well as state relativity factors, base rate relativity and severity factors, and loss weighting patterns – all specific parameters and factors developed by Mason over many years based on his extensive knowledge and expertise and prior to his employment with AmTrust. This is not generic information.

33.    Moreover, as further evidence of the high level of sophistication and complexity of the Mason Proprietary Pricing Tool is that the software's Summary Input Output module comprises thousands of rows of data.

34.    The Mason Proprietary Pricing Tool also comprises a highly unique "Facultative Pricing" module developed by Mason – prior to his employment with AmTrust – and based solely and exclusively on his industry experience on the reinsurance side of the business where he was a facultative and treaty underwriter for over ten (10) years prior to his employment with AmTrust.

35.    The Facultative Pricing module is a reinsurance pricing feature built into the rating Tool that allows primary company underwriters to benchmark target pricing. This specific module feature was used by Mason's underwriting team during his employment with AmTrust wherein they would buy down their net limits on a per risk basis (*i.e.*, "net limits" management). This

dynamic feature in the Tool ensured that the AmTrust underwriters on Mason's team would not be taken advantage of by reinsurers looking to leverage them on price. The Facultative Pricing module is far from generic and very unique – it separated Mason's underwriting team from that of AmTrust's competitors who likely do not possess such a capability.

36.     The "Cyber" module of the Mason Proprietary Pricing Tool is comprised of seventeen (17) technology sub classes with relativity, severity and cyber risk rating factors. Again, all features, data, including ILF's and hazard ratings in the Cyber module were developed solely and exclusively by Mason prior to his employment with AmTrust.

37.     Another example of the Mason Proprietary Pricing Tool's unique analytical property is the Tool's "size adjustment of rate factor," exclusively created and developed by Mason, which is used for larger accounts such as larger law firms. This feature provides an additional approach to pricing larger risks. For example, when pricing a large law firm by adding the individual law firms' revenue, in addition to the number of attorneys , this "size adjustment of rate factor" feature applies a Burr scale of size factor – essentially, leveling and softening pricing at higher revenues.

38.     Actuarial supported formulas and algorithms were programmed throughout the entirety of the Tool and may be viewed in their respective cells. Analysis includes a Pareto Distribution that smooths out the empirical distribution. The parameters of the Pareto Distribution were determined by Mason after reviewing percentile matching information. The points at which the distribution function was evaluated and the weighting given to the differences were selected judgmentally by Mason considering the purpose for which the curve was being fitted. Severity distribution was trended by professional class to certain assumed loss dates. This was accomplished by class/sub line to develop average loss dates that are assumed under the primary policy for each of the 10 major classes being priced. Because the parameters underlying the

severity distributions are subjective and based upon Mason's knowledge and expertise, the distribution factors may be modified to reflect parameter uncertainty. Moreover, the average severity per ground up claim was developed using the formula LEV (Limited Expected Value). Assumptions were also developed solely and exclusively by Mason and applied for severity (Increase Limit Factors or ILF's) by major class and sub line for all practice areas based upon his knowledge and experience. A Burr severity analysis was also applied.

39.   Mason further developed, solely and exclusively, and incorporated into the Mason Proprietary Pricing Tool a "Metropolitan Debit" feature based upon a combination of personal and third-party vendor information exclusively obtained and compiled by Mason. The Metropolitan Debit module was created for this purpose and includes a list of the top 30 major metro areas in the U.S. and was intended by Mason for underwriters to review and select from.

40.   In the Tool's "Exposure Input" module, Mason created dedicated exposure templates with criteria specific for each of the 10 major classes wherein each criteria incorporates relativity and severity ILF's developed, solely and exclusively, by Mason. This information pivots into the Summary Input Output module based upon underwriting selection.

41.   The pivot module of Classes includes base rate relativity and severity ILF factors for all 131 sub lines that were created and developed solely and exclusively by Mason. These factors were developed by Mason based upon his experience and knowledge and the formulas therein further pivot into the Summary Input Output module.

42.   The aforementioned features, modules, tools, etc. are but a sample of that offered by the Mason Proprietary Pricing Tool. The Tool comprises many additional features, complexities, modules, etc., all of which provide immense value.

C.   **The Mason-Compiled Data**

43.   In addition to the thousands of programmed algorithms, calculations, formulas and data processing analytical components comprising the various modules of the Mason Proprietary Pricing Tool, the program was foundationally created and developed upon tens of thousands of data points solely and exclusively compiled by Mason over a twelve (12) year period prior to his employment with AmTrust (collectively, all such data compiled by Mason relative to the Mason Proprietary Pricing Tool, the "Mason-Compiled Data").

44.   Professional liability Excess & Surplus ("E&S") carrier information is very difficult to obtain, especially when compared with the other General Liability ("GL") E&S data and information which is standard, ISO[1] driven and pricing is essentially generic and easily accessible. Insurance carrier product filings can be obtained, but to do so is time consuming and costly.  Upon information and belief, third-party vendors charge thousands of dollars to obtain just one admitted product filing from one carrier in one class of business.

45.   The Mason-Compiled Data comprises, among other sources, data compiled exclusively by Mason from more than thirty (30) different carriers over a twelve-year period.

46.   The Mason-Compiled Data comprises, among other sources, data compiled exclusively by Mason over a twelve-year period from numerous other third parties, including, but not limited to, Martin & Company, Silver Plume, ISO, FBI Internet Crime Complaint Center, American Bar Association, as well as reports from private law firms Degan, Blanchard & Nash and Wilson, Elser, Moskowitz, Edelman & Dicker.

47.   While certain of the Mason-Compiled Data is publicly available and was collected and compiled by Mason through third party vendors from admitted product filings, outside law

---

[1] International Organization for Standardization.

firms and associations like the American Bar Association (ABA), critical to the use and incorporation of the Mason-Compiled Data in the Mason Proprietary Pricing Tool was the application of Mason's intellectual capital from his extensive product knowledge and expertise from over 30 years in the industry that went into the relativity assumptions in the Tool's various pivot modules, including the class and sub class mix, state mix, lost development factors and exposure by class – all of which are critical to pricing each risk. This information comprising Mason's intellectual capital is not generic and when applied to the Mason-Compiled Data, the credibility and accuracy of the Tool increases exponentially.

48.    The Mason-Compiled Data comprising the Mason Proprietary Pricing Tool is extremely valuable, not readily available, proprietary and a trade secret. The Mason-Compiled Data belongs solely and exclusively to Mason.

### D.    AmTrust Hires Mason to Create New Professional Liability Business/Product Line

49.    On or about September 27, 2013, AmTrust hired Mason to create and develop a professional liability product line for the company: a true "startup" business. Upon information and belief, at that time AmTrust did not have a professional liability product line.

50.    Prior to Amtrust hiring Mason, the Parties had discussions concerning how Mason would create, develop and build a professional liability product line for AmTrust. During those discussions, Mason disclosed to AmTrust the Mason Proprietary Pricing Tool, which had been fully developed by Mason by that time.

51.    Prior to Amtrust hiring Mason, Mason met with AmTrust CEO and Chairman of the Board of Directors Barry Zyskind ("Zyskind") and defendant Lewis at AmTrust's offices in New York, NY (the "Meeting"). When Mason was asked by Zyskind at the Meeting – in the presence of Lewis – as to how Mason intended to price the new line of business, Lewis himself responded

"Gene has his own pricing tool that he developed which he will use."

52.    Upon information and belief, Amtrust had no comparable pricing tool or any other means for pricing the professional liability products and business for which AmTrust sought to hire Mason to develop.

53.    Upon further information and belief, developing a similar pricing tool by AmTrust would take years and cost AmTrust substantial amounts of money.

54.    The use by Mason of the Mason Proprietary Pricing Tool to create, develop and build a professional liability product line for AmTrust was conditioned on Mason's employment with the company.   At no time did Mason ever transfer ownership, directly or indirectly, of the Tool to AmTrust – at the Meeting or otherwise.

55.    At the Meeting, the Parties reached a specific, concise meeting of the minds as to Mason's employment with AmTrust and the sole and exclusive use by Mason and his proposed underwriting team of the Mason Proprietary Pricing Tool for pricing the proposed professional liability products to be developed.   As such, Mason felt no need for a formal written licensing agreement as the Parties had reached an agreement at the Meeting that the Tool was Mason's property and that its use for AmTrust was solely conditioned on Mason's employment with AmTrust and the financial compensation to be paid by AmTrust to Mason in accordance with the terms and conditions of his employment (hereinafter, the "License").

56.    The terms of Mason's employment with AmTrust were memorialized in a written agreement entitled "Offer of Employment" dated September 26, 2013 (the "Employment Agreement").   Significantly, the Employment Agreement does not provide that Mason conveys any right or interest in or to his Tool to AmTrust.  Nor would it, as the Parties never intended that AmTrust would acquire any rights whatsoever in the Mason Proprietary Pricing Tool, other than

the License provided by Mason to AmTrust as a condition of his employment and compliance by AmTrust of its obligations to Mason under the terms and conditions of the Employment Agreement, particularly as to the financial compensation obligations owed by AmTrust to Mason.

57.   The Employment Agreement provided that Mason would be paid bonus compensation equal to three percent (3%) of "Net Underwriting Income" (the "Underwriting Bonus") in addition to other terms and conditions, including a standard discretionary bonus arrangement.

58.   When Mason was hired by AmTrust as a Senior Vice President, Professional Liability, he was hired with the explicit understanding under the License arrangement (by both Mason and senior executives at AmTrust, including both Lewis and Zyskind, among others) that Mason would use and license the Mason Proprietary Pricing Tool to AmTrust for their joint use during his employment tenure with the company.  Under the License, the Parties expressly understood that the Mason Proprietary Pricing Tool would remain Mason's personal property, and that AmTrust would not acquire any rights in and to the Tool, or any other rights, except as may be granted by Mason at his discretion and from time to time under the limited License during and subject to the term of Mason's employment.

59.   On or about October 13, 2013, shortly after he was hired, Mason e-mailed the Mason Proprietary Pricing Tool to Lewis, his soon-to-become manager at AmTrust, from his personal e-mail account, simply stating " Dave, Here's my pricing tool" – clearly reinforcing his ownership interest in his proprietary and personal property.  Again, Mason did so with the understanding that the tool was and would remain his sole and exclusive property and that AmTrust was licensing it from him on a limited and discretionary basis under the License during Mason's term of employment with Mason.  Lewis received and accepted the Tool and delivered it to AmTrust.

Neither Lewis nor AmTrust questioned the ownership of the Tool.

60.    For the next six (6) years and a total of $186M gross written premium, Mason and AmTrust continued to use the Mason Proprietary Pricing Tool in interstate commerce part and parcel with the terms and conditions of his employment with AmTrust and pursuant to the License for the Tool from Mason to AmTrust.

### E.    Mason Maintains and Protects His Proprietary Interest and Ownership in the Mason Proprietary Pricing Tool

61.    After commencing employment with AmTrust, Mason undertook various steps and measures to properly maintain his ownership rights and interests in and to the Mason Proprietary Pricing Tool and ensure the integrity, secrecy, protection and confidentiality of the Tool in terms of its proprietary methods, processes, calculations, algorithms and formulas as well as the Mason-Compiled Data incorporated therein.

62.    Commencing with his first day of employment with AmTrust until his termination, Mason always referred to the Mason Proprietary Pricing Tool as his personal and proprietary property, including management meetings whenever discussion turned to the Tool.  At no time did AmTrust ever object or refute Mason's characterization of the Mason Proprietary Pricing Tool as Mason's personal property.

63.    At no time was the Mason Proprietary Pricing Tool stored on AmTrust's central operating system and servers.  For all relevant time periods, AmTrust maintained a computer system for the electronic storage of all of its owned, licensed or proprietary software, referred to as ANA 2.0, 3.0.  Mason specifically kept the Tool outside of AmTrust's ANA 2.0 and revised ANA 3.0 operating systems during the nearly six (6) years that Mason was employed by AmTrust. Mason insisted that the Tool not be stored on AmTrust's central corporate operating system – where it may be viewed by others outside of Mason's team – and that it be maintained separately

at the sole and exclusive direction of Mason. This was intentional and intended to safeguard Mason's ownership of the tool. AmTrust, per Lewis, complied with Mason's directives.

64.     AmTrust company policy regarding software and technology would have required that AmTrust host the Mason Proprietary Pricing Tool on its own systems, but AmTrust did not do so because it recognized that the Tool was the property of Mason.

65.     Mason further insisted that internal AmTrust auditors and external third-party vendors be denied access to the Mason Proprietary Pricing Tool for fear that the valuable software may be copied. Again, AmTrust, per Lewis, complied with Mason's directives.

66.     Despite Mason's insistence of the unique treatment of the Mason Proprietary Pricing Tool, AmTrust complied with Mason's demands. This was far different than the other E&S business for which Lewis was responsible, wherein the rating/pricing capabilities were built directly into the ANA operating system. Upon information and belief, the other E&S business under Lewis' management represented approximately $135M annualized GL business.

67.     Mason undertook all precautionary steps to ensure that the Mason Proprietary Pricing Tool was never accessed by third party vendors – and, upon information and belief, no third-party vendors ever gained access to the Tool. Indeed, Mason, and Lewis at Mason's instance, directed the Amtrust Ceded Reinsurance Department that the Mason Proprietary Pricing Tool should not be shared with reinsurance underwriters prior to or during audits. While employed at AmTrust, to Mason's knowledge his Tool was never shared or sent to any third-party reinsurers. To the extent that AmTrust has shared the Tool with any third-party reinsurers, it was done after Mason was terminated from AmTrust, or without his knowledge.

68.     All of Mason's direct reports and team members were trained by him and instructed to copy just a "snapshot" of the final Summary Input Output module page to save in each bound

underwriting file in ANA 3.0. The snapshot was a pdf image file of the final underwriting worksheet, so the actual pricing Tool was protected from third-party vendors , or other internal AmTrust auditors that may audit underwriting files. To Mason's knowledge, no third-party vendors accessed the Mason Proprietary Pricing Tool during Mason's employment with AmTrust.

69.   Apart from licensing it to AmTrust, Mason did not share the Mason Proprietary Pricing Tool with anyone else.

70.   The Mason Proprietary Pricing Tool was kept secret and was and remains a trade secret.

### F.   Mason Refuses to Sign the Transfer Document

71.   In or about May 2016, Mason was requested by AmTrust general counsel David Saks ("Saks") to sign a proprietary rights document (the "Transfer Document") that would effectively transfer and convey Mason's ownership rights in and to the Mason Proprietary Pricing Tool to AmTrust. Mason refused to sign the Transfer Document, thereby further evidencing his intent to protect and maintain his ownership rights in and to his personal, proprietary property.

72.   Through an orchestrated email campaign, Saks threatened Mason – either Mason change his position and execute the Transfer Document to convey and assign the Mason Proprietary Pricing Tool to AmTrust, or AmTrust would withhold financial bonuses due and owing to Mason. Mason maintained his position, refusing to sign the Transfer Document.

73.   Mason's refusal to sign the Transfer Document had everything to do with Mason protecting his proprietary rights and ownership interests in and to the Mason Proprietary Pricing Tool that he had created and developed before commencing employment with AmTrust and which Mason never intended to convey or transfer to the company.

74.   Lewis was aware of Mason's refusal to sign the Transfer Document and advised Mason that he understood and would support Mason's position.

75. The Employment Agreement provided that Mason would be paid bonus compensation equal to three percent (3%) of "Net Underwriting Income" (the "Underwriting Bonus") in addition to the normal discretionary bonus.

76. In retaliation of Mason's refusal to sign the Transfer Document, on or about May, 2016, AmTrust withheld Mason's Underwriting Bonus.  Only after Mason complained of the retaliation to AmTrust's then general counsel, Stephen Unger, did AmTrust pay Mason an insulting $17,000; representing the *only* 3% Underwriting Bonus he received in 6 years against $186M GWP.

## G.   AmTrust Terminates Mason; AmTrust Breaches the Employment Agreement and the License

77. On July 17, 2019, Mason was abruptly terminated from his position with AmTrust. AmTrust, through its officers, then lied to Mason about the reason and basis for his termination.

78. Shortly thereafter, on July 19, 2019, Mason, through his legal counsel, sent AmTrust a cease and desist letter demanding that AmTrust immediately stop using the Mason Proprietary Pricing Tool.

79. On July 24, 2019, AmTrust responded to Mason's letter, which denied being in possession of what it considered "proprietary information" or "trade secrets" owned by Mason but did not deny its use (or continued use) of the Mason Proprietary Pricing Tool.

80. The Mason Proprietary Pricing Tool has substantial value.  Upon information and belief, AmTrust continues to use and disseminate the tool to his detriment and is generating millions of dollars in revenues and profits by using the tool without Mason's consent, depriving Mason of the possession and dominion of his personal property of which he is the sole and exclusive owner.

81. Indeed, every additional employee that gains access to the tool, and every insurance

policy that is underwritten using information contained in the tool or analyzed through it, damages Mason.

82.    As a result of AmTrust's deliberate refusal to cease and desist from using the Mason Proprietary Pricing Tool and return all copies of same to Mason, AmTrust is in breach of the License that Mason provided to AmTrust as to AmTrust's limited and conditioned right to use the Tool and only in Mason's sole and absolute discretion.

83.    During all relevant periods of employment, AmTrust further failed to pay (or substantially underpaid), the Underwriting Bonus.

84.    As a result, Amtrust breached the Employment Agreement by failing to pay the Underwriting Bonus.

85.    At all times, the Mason Proprietary Pricing Tool was designed, developed, and updated by Mason.  At all times, Mason was, and remains, the sole and exclusive owner of the Mason Proprietary Pricing Tool.  At no time, ever, did Mason sell or assign his sole and exclusive rights in and to the Mason Proprietary Pricing Tool to AmTrust.

## CAUSES OF ACTION

### COUNT I

### MISAPPROPRIATION OF TRADE SECRETS, DEFEND TRADE SECRETS ACT, 18 U.S.C. §§1831-1839

86.    Plaintiff repeats and realleges every allegation contained in the preceding paragraphs by reference as though fully set forth herein.

87.    The Mason Proprietary Pricing Tool, comprising of raw data accumulated solely and exclusively by Plaintiff (*i.e.*, the Mason-Compiled Data), combined with actuarial supported analysis and algorithmic calculations entered into the Tool by Plaintiff or at his direction, are trade secrets subject to protection under the Defend Trade Secrets Act, 18 U.S.C. §§1832, 1836.

88. The Mason Proprietary Pricing Tool, including the Mason-Compiled Data, derives independent economic value by not being generally known to or accessible, through proper means, to competitors, such as AmTrust, who can profit from its explicit and/or implicit and/or intentional and/or inevitable use or disclosure.

89. The Mason Proprietary Pricing Tool, including the Mason-Compiled Data, is related to a product or service used in or intended for use in interstate commerce.

90. Plaintiff has taken reasonable measures under the circumstances to maintain the secrecy of the Mason Proprietary Pricing Tool and the Mason-Compiled Data.

91. AmTrust and Lewis were both privy to the Mason Proprietary Pricing Tool and the Mason-Compiled Data solely as a result of the promise and implied license by AmTrust and Lewis to use the Mason Proprietary Pricing Tool and the Mason-Compiled Data tool at Plaintiff's discretion, maintain its secrecy, to keep the information confidential, and to only use it for the benefit of AmTrust at Plaintiff's discretion.

92. By continuing to use the Mason Proprietary Pricing Tool and the Mason-Compiled Data despite Plaintiff's revocation of the license, AmTrust and Lewis are knowingly stealing, or without authorization, appropriating, taking, and carrying away such protected trade secret information.

93. AmTrust and Lewis are engaged in this conduct intending or knowing that it will injure Plaintiff, the sole and exclusive owner of the Mason Proprietary Pricing Tool and the Mason-Compiled Data – the trade secrets at issue.

94. The foregoing conduct of AmTrust and Lewis constitutes a misappropriation and misuse of Plaintiff's confidential, trade secret information.

95. The Defend Trade Secrets Act provides that any organization that commits an offense

under the Act "shall be fined not more than the greater of $5,000,000 or 3 times the value of the stolen trade secret to the organization." 18 U.S.C. §1832(b).

96.    AmTrust and Lewis acted willfully and maliciously in misappropriating Plaintiff's confidential, trade secret information for their own benefit and to the intended detriment of Plaintiff.

97.    As a consequence of the foregoing, Plaintiff has suffered and will continue to suffer economic losses, including but not limited to, lost business, as well as irreparable harm and loss of goodwill, and Plaintiff is entitled to compensatory damages in an amount yet to be determined pursuant to 18 U.S.C. §1836(b)(3)(B), exemplary damages pursuant to 18 U.S.C. §1836(b)(3)(C), attorney's fees, expenses, and costs pursuant to 18 U.S.C. §1836(b)(3)(D), and such other legal or equitable relief that this Court deems just and proper.

## COUNT II

### MISAPPROPRIATION OF TRADE SECRETS AND CONFIDENTIAL INFORMATION UNDER NEW YORK COMMON LAW

98.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs by reference as though fully set forth herein.

99.    Plaintiff has protectable trade secrets in the Mason Proprietary Pricing Tool and the Mason-Compiled Data incorporated therein.

100.    Plaintiff derives economic value and a competitive advantage from these trade secrets due to them not being generally known to other persons who could obtain economic value form its disclosure or use.

101.    Plaintiff has made efforts that are reasonable under the circumstances to maintain the secrecy of Plaintiff's trade secrets.

102.     In breach of the implied license, Defendants have used Plaintiff's trade secrets to unfairly compete with Plaintiff.

103.     Defendants have used Plaintiff's trade secrets information in bad faith for their own benefit and to the detriment of Plaintiff.

104.     Defendants' use and misappropriation of Plaintiff's trade secrets information constitutes a misappropriation of the trade secrets in violation of New York common law.

105.     As a consequence of the foregoing, Plaintiff has suffered and will continue to suffer economic losses, including but not limited to, lost business, as well as irreparable harm and loss of goodwill, and is entitled to compensatory damages as well as punitive damages, and such other legal or equitable relief that this Court deems just and proper.

## COUNT III

### UNJUST ENRICHMENT

106.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs by reference as though fully set forth herein.

107.     Plaintiff is entitled to compensation in an amount to be proven at trial and punitive damages as a result of Defendants' unauthorized use and conversion of Plaintiff's trade secrets, including the Mason Proprietary Pricing Tool and the Mason-Compiled Data incorporated therein.

108.     Upon information and belief, Defendants have been enriched as a result of the Defendants' misappropriation, conversion, and unauthorized use of Plaintiff's trade secrets to benefit Defendants and harm Plaintiff.

109.     The retention of the amount by which Defendants have been enriched as a result of AmTrust's and Lewis' unlawful conduct as alleged herein, is contrary to the principles of fairness, justice, and equity.

110.    Plaintiff is entitled to recover from Defendants the amount by which Defendants have been enriched as a result of their unlawful conduct as alleged in this Amended Verified Complaint.

## COUNT IV

### BREACH OF IMPLIED LICENSE

111.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs by reference as though fully set forth herein.

112.    Plaintiff permitted AmTrust and Lewis to use the Mason Proprietary Pricing Tool, and including the Mason-Compiled Data incorporated therein, under an implied license.

113.    The implied license was duly formed and understood by the Parties.

114.    The implied license was granted to AmTrust and Lewis as a condition of Plaintiff's continuing employment with AmTrust.

115.    AmTrust terminated Plaintiff's employment.

116.    The implied license granted by Plaintiff to AmTrust and Lewis terminated upon the termination of Plaintiff's employment.

117.    Plaintiff is entitled to recover from Defendants the amount by which Defendants have been enriched as a result of their unlawful use of the Mason Proprietary Pricing Tool following the termination of the implied license.

## COUNT V

### BREACH OF CONTRACT PERTAINING
### TO EMPLOYMENT COMPENSATION

118.    Plaintiff is entitled to be paid compensation referred to as Underwriting Bonuses, as set forth in the Employment Agreement of which AmTrust has wrongfully withheld from Plaintiff.

119.     Plaintiff is further entitled to be paid additional compensation under the terms and conditions of the Employment Agreement of which AmTrust has wrongfully withheld from Plaintiff.

120.     The Employment Agreement is a valid, binding and enforceable agreement between Mason and AmTrust.

121.     AmTrust breached the Employment Agreement by failing to pay the Underwriting Bonuses.

122.     AmTrust further breached the Employment Agreement by failing to pay Plaintiff Discretionary Bonuses pursuant to the terms and conditions of the Employment Agreement, ultimately ending in Plaintiff losing 70% of value of awarded stock options and further not being paid the remaining balance of awarded discretionary bonuses following his termination.

123.     AmTrust further breached the Employment Agreement by failing to pay Plaintiff additional compensation due and owing to Plaintiff pursuant to the terms and conditions of the Employment Agreement.

124.     Plaintiff is entitled to recover from AmTrust the entirety of the Underwriting Bonuses, the Discretionary Bonuses and such other compensation due and owing to Plaintiff that AmTrust wrongfully failed to pay to Plaintiff.

## PRAYER FOR RELIEF

**WHEREFORE**, Mason respectfully requests that this Court enter judgment in his favor, and against Defendant AmTrust on all counts and Defendant Lewis on only count 1, and award him the following relief:

    a)    Monetary damages against Defendants, jointly and severally, through compensatory damages, actual losses, and disgorgement of Defendants' ill-gotten profits;

b)   Exemplary and punitive damages as a result of Defendants' willful, intentional, and malicious conduct;

c)   Treble damages;

d)   Reasonable attorney's fees, including interest and costs incurred in this action; and

e)   Equitable relief in the form of declaratory judgment that the Mason Proprietary Pricing Tool is the sole property of Mason;

f)   Equitable relief in the form of an injunction and constructive trust in favor of Mason; and

g)   All such other and further relief and remedies as this Court deems just and proper and as are justified by the evidence presented at trial in this proceeding.

Respectfully submitted,

Dated: October 18, 2019                     **JARDIM, MEISNER & SUSSER, P.C.**

Richard S. Meisner, Esq.
Richard A. Catalina, Jr., Esq.
(*pro had vice* admission pending)

## VERIFICATION

Plaintiff, Eugene Mason, hereby declares under penalty of perjury that the following statements made by him are true and correct.

1.  I am the plaintiff in this matter.

2.  I have reviewed the Amended Verified Complaint.

3.  I know or believe that all of the factual allegations of which I have personal knowledge to be true.

4.  I believe that all of the factual allegations of which I do not have personal knowledge to be true based on information and belief, documents, or both.

Eugene Mason

Dated: October 17, 2019

30