UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X
EUGENE MASON,                                    Case 1:19-cv-08364-DLC

            Plaintiff,

   -against-


AMTRUST FINANCIAL SERVICES, INC.
and DAVID LEWIS,

            Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X



### DEFENDANT AMTRUST FINANCIAL SERVICES, INC.'S MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S EXPERT EVAN D. BENNETT



        William E. Vita, Esq.
        WESTERMAN BALL EDERER
        MILLER ZUCKER & SHARFSTEIN, LLP
        1201 RXR Plaza
        Uniondale, New York 11556
        Telephone:  516-622-9200
        *Attorneys for Defendant*
        *AmTrust Financial Services, Inc.*

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ................................................................................. 1

II.  LEGAL STANDARD............................................................................................... 4

III. ARGUMENT............................................................................................................ 6

    A.  Mr. Bennett Is Not Qualified to Opine on Amtrust's Incurred Loss or Net
        Underwriting Income Calculation................................................................. 6

    B.  Mr. Bennett's Testimony and Expert Report on Plaintiff's Bonus Calculated as a
        Percentage of Amtrust's Net Underwriting Income Must Be Excluded Because It Is
        Impermissibly Speculative and Based on False Data .................................................. 8

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Berlyn, Inc. v. Gazette Newspapers, Inc.*, 214 F. Supp. 2d 530, 538 (D. Md. 2002)...................... 7

*Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (1996)........................................................ 10

*Casey v. Merck & Co. Inc.,* 653 F.3d 95, 100 (2d Cir. 2011) ........................................................ 11

*Cerveceria Modelo, S.A. de C.V. v USPA Accessories LLC*, 07 CIV.7998 HB, 2008 WL 3919186, at *4 (S.D.N.Y. Aug. 25, 2008) ................................................................................. 9

*Deutsch v Novartis Pharm. Corp.*, 768 F Supp 420, 424–27 (EDNY 2011) (Spatt, J.).... 4, 5, 9

*E.E.O.C. v Bloomberg L.P.*, 07 CIV. 8383 LAP, 2010 WL 3466370, at *13 (S.D.N.Y. Aug. 31, 2010) ................................................................................................................................. 9

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) ................. 5

*Hardin v. Ski Venture, Inc.*, 50 F.3d 1291, 1296 (4th Cir. 1995) ..................................................... 7

*Hollman v Taser Intern. Inc.*, 928 F Supp 2d 657, 666 (EDNY 2013)........................................... 6

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)............................................................................................................................................ 4

*Lynch v. Trek Bicycle Corp.*, 374 Fed. App'x 204, 206 (2d Cir. 2010)........................................ 4

*Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) ............ 10

*Morales Elec. Contr., Inc. v Siemens Bldg. Tech., Inc.*, 09-CV-2743 ADS ETB, 2012 WL 3779410, at *5 (EDNY Aug. 30, 2012) (Spatt, J.)........................................................................ 6

*Primavera Familienstifung v. Askin,* 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001) ...................... 10

*Robertson v. Norton Co.*, 148 F.3d 905, 907 (8th Cir. 1998) ........................................................ 7

*Ruggiero v. Warner–Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005) ......................................... 9

*S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 677-78 (S.D.N.Y. 2013) .................................................. 7

*Scott v Chipotle Mexican Grill, Inc.*, 315 FRD 33, 55 (S.D.N.Y. 2016) ...................................... 9

*Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799-800 (4th Cir. 1989) .......................... 7

*Valente v Textron, Inc.*, 559 Fed Appx 11, 13–14 (2d Cir. 2014) ................................................. 9

*Wintz v. Northrop Corp.*, 110 F.3d 508, 514 (7th Cir. 1997) ......................................................... 7

*Zyprexa*, 489 F.Supp.2d at 284 ...................................................................................................... 9

**Statutes**

Federal Rules of Evidence 401 ........................................................................................................ 5

Federal Rules of Evidence 403 ........................................................................................................ 1

Federal Rules of Evidence 702 .................................................................................................... 1, 4

Defendant, Amtrust Financial Services, Inc. ("Amtrust"), respectfully submits this Memorandum of Law in support of its Motion *in Limine* to exclude the expert testimony and report of Evan D. Bennett ("Bennett") pursuant to Federal Rule of Evidence ("Fed. R. Evid.") 403 and Federal Rules of Evidence 702 (collectively, the "Rules"). As discussed in more detail below, Mr. Bennett admitted at his deposition that his opinion was based on guesses and assumptions provided by Plaintiff. For this reason, Mr. Bennett's opinions do not rise to the level of expertise and reliability required by the Rules.

## I.  PRELIMINARY STATEMENT

Mr. Bennett, Plaintiff's economics damages consultant, intends to offer unsupported and speculative opinion testimony that Plaintiff is entitled to a Net Underwriting Income bonus which is based on data **guessed at** by himself and Plaintiff. In arriving at his opinion, Mr. Bennett does not reference or use any accepted, standard or peer-reviewed methodology. Without an acceptable technique or methodology, his opinion is merely naked conjecture. Nor does he demonstrate that his reasoning is valid and should therefore be applied to the facts of this case. To the contrary, Mr. Bennett freely and unabashedly use the word "guess" to describe one of the numerical components of his calculations. Rather than attest that his opinions are offered to a degree of expert certainty, Mr. Bennett makes the remarkable assertion, in his own report, that **the report "is for discussion purposes only** and no number on this sheet was verified/audited." (Mr. Bennet's Expert Report is attached hereto as Exhibit A.) Although Mr. Bennett is, perhaps, a man of startling candor, his attempt to submit his opinions for <u>discussion</u> <u>purposes</u> <u>only</u>, utterly fails to comply with the dictates of Rule 702. Mr. Bennett's opinion should be excluded.

First, Mr. Bennett does not possess the background or experience needed to determine the incurred claims losses or determine the Net Underwriting Income ("NUI") of Plaintiff's

1

professional liability insurance unit.  Actuaries determine the amount of claims losses.  While Mr.

Bennett has 38 years of experience in the insurance industry, he is not an actuary or certified public

accountant, and he has no experience calculating incurred losses in the insurance industry.  As

demonstrated in his deposition testimony[1], Mr. Bennett is unqualified to opine on Amtrust's

incurred losses or New Underwriting Income:

> Q:  Mr. Bennett, Have you ever taken a test to qualify as an actuary?
> A:  No.
> Q:  Are you qualified as an actuary?
> A:  No.
> Q:  Have you ever provided actuary services for an insurance company?
> A:  No.

Deposition of Even D. Bennett ("Bennet Dep."), dated November 16, 2020, at 7:16-23.

> Q:  Why is it that insurance companies use actuaries to calculate losses on insurance
> programs?
> A:  Can't answer that.  I don't know.

Bennett Dep. at 8:5-8

> Q:  What are the components that a person should look at in order to calculate
> losses on an insurance program?
> A:  I can't detail that.  There are several.  Everybody does it differently.

Bennett Dep. at 8:9-13.

> Q:  Do you know how actuaries go about setting incurred but not enough
> calculations?
> A:  No, I don't.
> Q:  Have you ever personally calculated incurred but not enough calculations for
> an insurance company?
> A:  No.

Bennett Dep. at 20:14-21. (The term "Incurred But Not Enough" is an insurance industry concept
and term that refers to claims that have been incurred but not enough information has yet been
assembled to fully analyze the claim.)

> Q:  Do you know what the industry standard is for loss ratios?
> A:  No.

---

[1] Mr. Bennett's deposition transcript has been submitted as AmTrust's Trial Exhibit I.

Bennett Dep. at 44:6-8.

Second, Mr. Bennett's opinion is unreliable because he is admittedly using his own wholly

unsupported estimates and guesses in calculating the 2018 incurred losses of Plaintiff's unit, which

wildly skews his NUI calculation:

> Q:  Is that gross written premium figure the $50 million figure that we previously discussed?
> A:  Yes.
> Q:  That's a figure that was provided by Mr. Mason and **you have seen no documentation to support that**; is that fair to say?
> A:  Yes.

Bennett Dep. at 24:11-19.  (Emphasis added.)

> Q:  Okay.  **How did you arrive at that $4 million figure**?
> A:  The 4 million that I mentioned in this paragraph, if you read the paragraph where on May 18 on Paul Poppish's spreadsheet which in 2018 year it was 54,855 incurred loss on that sheet for that year open and closed, and as Amtrust was—we didn't get an actual 2018 incurred loss number.  At December 31 I looked at the redacted amount from Paul Poppish, I guess he had a 52 million floor something number, so it would increase $10 million for the total number of years, and **just a guess, an assumption there, I guess $4 million,** it might have been conservative, it might not have been, but it's an assumption I made.

Bennett Dep. at 27:5-28:14.  (Emphasis added.)

> Q:  You're putting the losses at $4 million that would be a difference of about $29 million; am I right, sir?
> A:  I explained how I got to the 4 million, which was from Paul Poppish's report and the material which showed the incurred loss of 54 million—54 or 55,000 and the—for 2018 year in May 31 an increase of 10 million 5.  As I said, **we guessed at what that number would be.**

Bennett Dep. at 33:21-34:6.  (Emphasis added.)

Using erroneous data, guesses and assumptions, while simultaneously ignoring AmTrust's

audited and verified data which was made available to him several months ago, Mr. Bennett's

opinion is inherently and irredeemably unreliable.

For these reasons, the Court should exclude Mr. Bennett's expert testimony in its entirety.

## II.  LEGAL STANDARD

Under Federal Rule of Evidence 702, in order to allow expert witness testimony, the court must find that "an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Lynch v. Trek Bicycle Corp.*, 374 Fed. App'x 204, 206 (2d Cir. 2010) (internal quotations and citations omitted); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).  Rule 702 requires that a court fulfill this "gatekeeping" function by "mak[ing] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

The Daubert legal standard for admissibility of expert testimony under Rule 702 is well settled.

Rule 702 provides that:

> A witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based upon sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702.

A New York federal court explained the process for determining the admissibility of evidence in *Deutsch v Novartis Pharm. Corp.*:

> To determine whether expert testimony is admissible, the court must consider whether (1) <u>the witness is qualified as an expert to testify</u>

4

as to a particular matter; (2) <u>the witness has based his opinion upon reliable data and methodology</u>; (3) the expert's testimony on the particular subject is relevant because it will assist the trier of fact; and (4) <u>pursuant to Rule 403 the testimony's "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury</u>."

…

When dealing with challenges to the reliability of scientific evidence, the court must focus on the methodology that the experts used to draw a conclusion and not on the conclusion itself. *See Daubert*, 509 U.S. at 590, 595, 113 S.Ct. 2786; … see also *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (holding that "conclusions and methodology are not entirely distinct from one another," and that "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.")

…

 "The final part of a trial court's gatekeeping task is to determine whether an expert's testimony is 'relevant to the task at hand'; namely, whether the expert's reasoning or methodology can be properly applied to the facts before the court." … As stated in Federal Rule of Evidence 401, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. In Daubert, the Court described the Rule 401 relevance consideration as one of "fit," requiring a "valid scientific connection" between the subject matter of the expert's testimony and the factual issues to be determined by the jury. *Daubert*, 509 U.S. at 591–92, 113 S.Ct. 2786; *Lidle*, 2010 WL 2674584, at *4.

*Deutsch v Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 424–27 (E.D.N.Y. 2011) (Spatt, J.) (emphasis added, internal quotations and citations omitted) (ordering a Daubert hearing upon motions seeking to either exclude certain experts entirely or certain lines of expert testimony for failing to satisfy the requirements of Federal Rule of Evidence 702); *see also Morales Elec. Contr., Inc. v Siemens Bldg. Tech., Inc.*, 09-CV-2743 ADS ETB, 2012 WL 3779410, at *5 (E.D.N.Y. Aug.

30, 2012) (Spatt, J.) (ordering Daubert hearing on expert testimony regarding the computations and analysis of certain experts on damages).

The proponent of the expert testimony bears the burden of establishing the admissibility of such testimony under the Daubert framework by a preponderance of the evidence standard. *Hollman v Taser Intern. Inc.*, 928 F. Supp. 2d 657, 666 (E.D.N.Y. 2013).

Plaintiff has the burden of establishing that Mr. Bennett's testimony is admissible. Plaintiff cannot do so. Mr. Bennett's testimony is unreliable because he is not an expert on the calculation of incurred losses in the professional liability insurance industry, and his testimony is speculative and based on unsubstantiated, if not fictional or false data. Further, any minimal probative value is outweighed by danger of unfair prejudice, undue delay and waste of time. Mr. Bennett's testimony amounts to an impermissible attempt to speculate and offer opinions without any reasonable foundation, and therefore should be excluded.

### III.   ARGUMENT

#### A.  Mr. Bennett Is Not Qualified to Opine on Amtrust's Incurred Loss or Net Underwriting Income Calculation

Mr. Bennett is an insurance and reinsurance industry consultant and a subject matter expert in reinsurance accounting and auditing.  He is not, however, an actuary and has no demonstrated knowledge, skill, experience, training, or education that allow him to opine on the incurred losses of Plaintiff's professional liability insurance unit, let alone its Net Underwriting Income ("NUI"). The losses that are projected and factor into the NUI calculation for 2018 are at the heart of Mason's remaining claim. Yet Mr. Bennett lacks any specialized actuarial or accounting expertise in calculating incurred losses for the professional liability insurance sector. For this reason, Mr. Bennett's testimony is demonstrably unreliable, unfairly prejudicial to AmTrust, and should be excluded.

6

Federal courts routinely exclude experts with general expertise in a broad area but not having specific expertise in the sub-area or related area that is the subject of the testimony. *See S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 677-78 (S.D.N.Y. 2013) (recognizing it is insufficient to demonstrate that a proposed expert's area of expertise is "proximate" to the subject of his or her testimony in order to overcome that individual's lack of experience in that subject; noting that a proposed expert's apparent expertise in "the general area of structured finance" was "so broad a category as to become meaningless when particularized here to synthetic CDOs, a very specific type of security"). *See also Robertson v. Norton Co.*, 148 F.3d 905, 907 (8th Cir. 1998) (expert qualified to testify about a manufacturing defect was not qualified to testify about the adequacy of warnings); *Wintz v. Northrop Corp.*, 110 F.3d 508, 514 (7th Cir. 1997) (despite general qualifications as a toxicologist, the expert could not testify because of his lack of specific experience with bromide and birth defects); *Hardin v. Ski Venture, Inc.*, 50 F.3d 1291, 1296 (4th Cir. 1995) (experience in ski safety policies and testimony in other ski accident cases did not qualify expert to opine about snowmaking machine safety); *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799-800 (4th Cir. 1989) (expert with MBA and experience analyzing companies' business health not qualified to give antitrust testimony where she had no specific education or experience in antitrust matters); *Berlyn, Inc. v. Gazette Newspapers, Inc.*, 214 F. Supp. 2d 530, 538 (D. Md. 2002) (extensive background in the publishing industry did not qualify the expert to offer opinions on antitrust, economics and relevant market analysis simply because the topics related to newspapers).

Here, Plaintiff was employed by AmTrust in the field of professional liability insurance. Mr. Bennett is not, and does not claim to be, an expert in calculating loss ratios for professional liability insurance carriers. In fact, Mr. Bennett has *never* calculated loss ratios in any employment

or consultant setting in the insurance industry.  Deposition of Evan D. Bennett ("Bennett Dep.")
at 20:14-21.  Not once in Mr. Bennett's nine-page curriculum vitae are the words "professional
liability", "loss ratio", or "net underwriting income" mentioned.  He is not an actuary and has never
provided actuary services for an insurance company.  Bennett Dep. at 7:16-23.  He has no
substantive experience in the professional liability insurance industry or setting loss ratios for
professional insurance companies, yet he opines that Amtrust's calculation is incorrect without
explanation.  Bennett Dep. at 44:6-8.

     As such, Mr. Bennett cannot proffer testimony as an expert on Amtrust's incurred losses
or NUI and his testimony should be excluded.

### B. Mr. Bennett's Testimony and Expert Report on Plaintiff's Bonus Calculated as a Percentage of Amtrust's Net Underwriting Income Must Be Excluded Because It Is Impermissibly Speculative and Based on False Data

     Mr. Bennett's calculation of Plaintiff's bonus is cursory, conclusory and unsupported.  It
contains no mathematical computations. The single spreadsheet that purportedly contains his
analysis (attached to his report as Annex C) is largely, if not completely, unreadable.  Mr. Bennett
admittedly disregarded audited and verified data provided by AmTrust in discovery and, instead,
manufactured data either out of thin air or based upon Plaintiff's own calculations, which are not
disclosed or explained in any detailed fashion.  Consequently, instead of dealing with the actuarial
principles that underlie the NUI calculation and supporting data, he makes baseless assumptions
and substitutes his own data which, unsurprisingly, wildly skews the bonus calculation.[2]  Because
Mr. Bennett is not offering an expert opinion arrived at through a proper methodology or based on
sufficient or reliable facts and data, his testimony and opinions must be excluded.

---

[2] Plaintiff's bonus is calculated as 3% of his unit's "Net Underwriting Income", which is defined as calendar year earned premium less incurred losses and expenses.  In his report, Mr. Bennett does not dispute the expense portion of AmTrust's data.

Mr. Bennett's report fails to demonstrate that his methodology and reasoning (to the extent that such a methodology exists) are valid and can be applied to the facts of the case.  Indeed, he describes no organized methodology or technique and therefore his naked conclusions: 1) have not and cannot be tested; 2) have not and cannot be subject to peer review; 3) have no known or knowable potential error rate; and 4) are based on no known standards with widespread acceptance.

Federal courts exclude expert testimony when it is clear the expert is not using reliable data.  "[W]hen an expert opinion is based on data, methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Deutsch v Novartis Pharm. Corp.*, 768 F Supp 3d 420, 424–27 (E.D.N.Y. 2011); *Zyprexa*, 489 F.Supp.2d at 284 ("Expert opinions based on insufficient facts or data, or on unsupported suppositions is not acceptable."); *Valente v Textron, Inc.*, 559 Fed Appx 11, 13–14 (2d Cir. 2014) ("Where, as here, data is 'simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Ruggiero v. Warner–Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005) (internal citations quotation marks omitted)"); *Cerveceria Modelo, S.A. de C.V. v USPA Accessories LLC*, 07 CIV.7998 HB, 2008 WL 3919186, at *4 (S.D.N.Y. Aug. 25, 2008) (precluding expert from testifying when the report was based on insufficient facts and relied on selective information provided by the proponent's attorney); *E.E.O.C. v Bloomberg L.P.*, 07 CIV. 8383 LAP, 2010 WL 3466370, at *13 (S.D.N.Y. Aug. 31, 2010) (finding expert's testimony and report irrelevant and unreliable); *Scott v Chipotle Mexican Grill, Inc.*, 315 FRD 33, 55 (S.D.N.Y. 2016) (granting defendant's request to exclude Plaintiff's expert testimony that relied on unverified data from the plaintiff).

Here, Mr. Bennett admitted during his deposition that his loss ratio and net underwriting income calculation is based on his own guesswork, rather than the data provided by AmTrust

*which was audited and verified by a third-party public accounting firm.* Bennet Dep. at 24:15-19; 27:22-28; 29:2-5; 33:21-34:6. In fact, Mr. Bennett makes no effort to address the data provided by AmTrust in discovery. Instead, he generates his own data based on his own conclusory "estimations" which cannot serve as a basis for an expert opinion. *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (1996) ("expert testimony should be excluded if it is speculative or conjectural"); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (rejecting expert's conclusory statement where it was not accompanied by "any evidentiary citation" or any elaboration of the expert's reasoning).

For example, Mr. Bennett states that he "used the 'Gross Written Premium' figure for the 2018 year supplied by Mr. Mason" in his calculations[3]. Mr. Bennett does not explain why he is using Plaintiff's own premium calculation or refer to any underlying evidence supporting Plaintiff's data. He also admittedly "guessed" that Plaintiff's unit incurred losses of $4 million for the calendar year of 2018 without providing any basis or explanation as to why this number is accurate or reliable.[4] Bennett Dep. at 33:21-34:6. Mr. Bennett's use of speculative "data", offered without any evidentiary basis, renders his opinion inherently unreliable and fails to assist the finder of fact in determining the issues at hand.[5] *Primavera Familienstifung v. Askin,* 130 F. Supp. 2d 450, 529 (S.D.N.Y. 2001) (if an expert "fail[s] to establish a basis for his opinion" and the opinions

---

[3] Plaintiff's Gross Earned Premium figure is $50 million for the calendar year of 2018, while Amtrust's Earned Premium figure is $45.7 million for the same time period.

[4] In contrast, Amtrust's verified data reveals an incurred loss amount of $33,500,000 for the calendar year of 2018 as of December 31, 2018, which is when Plaintiff's bonus would be calculated.

[5] In fact, Mr. Bennet admits that his report, on which he bases is opinion on, uses unverified and unaudited information:

> Q: The first sentence says, "The above," meaning the spreadsheet, "Above is for discussion purposes only, and no number on this sheet was verified/audited"; is that accurate, sir?
> A: Yes

Bennet Dep. at 44:6-8.

are merely conclusory, a court has the discretionary authority to strike the opinion as being unreliable and unhelpful), *abrogated on other grounds by Casey v. Merck & Co. Inc.,* 653 F.3d 95, 100 (2d Cir. 2011).

For all of the foregoing reasons, Amtrust respectfully requests that this Court issue an Order excluding evidence, testimony, references, or argument concerning Evan D. Bennett's expert opinion.

Dated: Uniondale, New York
      November 20, 2020

By: _____
      WILLIAM E. VITA

02297729

11

# EXHIBIT A

**Evan D. Bennett**
921 Longmeadow Drive
Geneva, IL  60134
773-230-0554
evandbennett@msn.com

October 30, 2020

Richard S. Meisner, Esq.
Jardim, Meisner & Susser, PC
30-B Vreeland Road, Suite 100
Florham Park, New Jersey 07932

Re:    **Expert Report**
       **Mason v. AmTrust Financial Services, Inc.**
       **Case 1:19-cv-08364-DLC**

Dear Mr. Meisner:

This report discusses my opinion with regard to economic damages pertaining to the compensation bonus due under an Employment Agreement between the plaintiff, Mr. Gene Mason ("Mr. Mason"), and the defendant, AmTrust Financial Services, Inc. ("AmTrust").

I am a consultant in the Insurance and Reinsurance industry with more than 38 years of experience. I am also a subject matter expert in reinsurance accounting and auditing.  I work with reinsurers, ceding companies, intermediaries, state insurance departments and regulators, Special Deputy Receivers and insurance law firms and have been engaged in projects that require expertise in both insurance and reinsurance.  My resume is attached hereto as **Annex A**.

In preparing and issuing this opinion, I relied upon the following:

1.    An AmTrust spreadsheet, attached as **Annex B**, prepared in connection with the above-referenced litigation that purports to demonstrate the Net Underwriting Profit calculation AmTrust used with respect to a contractual three percent (3%) bonus due to Mr. Mason ("AmTrust Calculation Spreadsheet");

2.    A "Loss Run" report (a Monthly Management Report in the form of a spreadsheet) prepared by AmTrust and AmTrust's Vice President and senior claims manager, Paul Poppish, and dated May 31, 2018 (the "May Management Report") and the "excess and surplus lines" redacted document prepared by Amtrust which lists information through December 31, 2018.

3.    The Employment Agreement between AmTrust and Mr. Mason; and

4.    Several interviews with Mr. Mason wherein he provided information and knowledge along with his own calculations of "Gross Written Premiums" and reinsurance contract information including known large losses, potential recoveries, and reinsurance ceding commissions.

Moreover, it should be noted that I requested certain supporting information from you, that you indicated was requested in discovery from AmTrust; however, it is my understanding that AmTrust did not provide such information to you in the discovery process. In addition, the information provided by AmTrust did not contain documentation that would support several items in the AmTrust Calculation Spreadsheet.

For example, AmTrust did not produce documentation or information regarding allocation of expenses to Mr. Mason's department; the method of allocation of overhead costs to Mr. Mason's department; reinsurance agreements; and earned premium calculations. Further, AmTrust failed to provide a general description as to how AmTrust's spreadsheet was prepared or any source documents whatsoever.

Section 1(b) of the Employment Agreement addresses Mr. Mason's right to both (i) a bonus based upon the Net Underwriting Income of the applicable business during the term of employment, and (ii) a discretionary bonus determined by AmTrust at its discretion, but subject to a contractual obligation to that such bonus be "paid" no later than the end of the year following the applicable year for which the bonus applies. This report will only address the Net Underwriting Income for the calendar year (bonus year) of 2018.

## Net Underwriting Income Bonus

I performed a review of the amount of the 3% bonus compensation that was calculated by AmTrust and presented on the AmTrust Calculation Spreadsheet, which was to be calculated on an annual basis (paid by May of the following year) and was to be equal to 3% of the Net Underwriting Profits. As Mr. Mason indicated in his interview with me, AmTrust did not pay a 2018 bonus.

After reviewing the material that I received, noting the discussions with Mr. Mason, and based upon my experience, I performed a separate calculation of what I considered to be the 3% net underwriting bonus that Mr. Mason was entitled to initially in respect to each year of his employment; however this report only presents my opinion with respect to 2018. By reason of AmTrust not providing complete information, and only providing certain redacted information, I made the following assumptions performing my calculations which I believe are supported, reasonable and conservative based upon what we have discovered:

1.    I included credit for ten (10) large loss reinsurance recoveries that were excluded from the AmTrust Calculation Spreadsheet, and as noted and provided by Mr. Mason;

2.    I used the "Gross Written Premium" figure for the 2018 year supplied by Mr. Mason and assumed that they would be fully earned;

3. Expenses came from AmTrust Calculation Spreadsheet as provided by AmTrust, which I relied upon and are included for illustrative purposes, although not supported by AmTrust; and

4. I estimated an incurred loss amount of $4,000,000 for calendar year 2018, even though AmTrust as of May 2018 showed only $54,855 of incurred loss, and as AmTrust did not provide the actual 2018 incurred loss number as of December 31, 2020, and view this as a conservative estimation.

I note the following key differences between AmTrust's calculations based on the limited information AmTrust produced and my analysis:

1. AmTrust showed data in its original that became known after the end of the 2018 bonus year and beyond Mr. Mason's termination of employment; and

2. The AmTrust Calculation Spreadsheet does not show reinsurance recoveries that mitigated losses for the benefit of AmTrust.

**Findings and Conclusion**

My spreadsheet analysis, as set forth in **Annex C**, is my opinion as to the calculation of Mr. Mason's bonus as owed to him under his Employment Agreement. However, I submit this spreadsheet with the following caveats:

1. None of the information provided in discovery was verified or audited;

2. All of the information was provided by either by AmTrust or Mr. Mason through respective counsel in connection with the litigation, and from public documents;

3. The analysis and results set forth in this opinion are based upon the information provided to me and are subject to change as new information becomes available; and

4. There was no supporting documentation or explanation of the allocation of AmTrust's expenses with regard to Mr. Mason's department.

Based on all of the above information, in my opinion, the amount of the Net Underwriting Income Bonus owed to Mr. Mason under his employment agreement, covering calendar year 2018 is:

**$ 1,004,082.00.**

I reserve the right to supplement and/or update my report as new evidence is made available to me.

Sincerely,

Evan D. Bennett

10-30-2020

# ANNEX A

<u>**CONFIDENTIAL**</u>

**Evan D. Bennett**
921 Longmeadow Drive
Geneva, IL  60134
773-230-0554

evandbennett@msn.com

I am a consultant in the Reinsurance and insurance industry with over 38 years of Insurance and Reinsurance experience. I have worked with reinsurers, ceding companies, intermediaries, state insurance departments, receivers and law firms. I have also served as an expert withness and consultant on various litigation and arbitration projects throughout my career. I have been engaged in projects that require expertise in both insurance and reinsurance including the following:

- Reinsurance audits: accounting/financial, underwriting, claims, forensic and operational
- Assistance to State Departments of Insurance, and Insurance Company Receivers on Reinsurance Issues
- Statutory accounting reviews and audits
- Reinsurance contract analysis and risk transfer reviews
- Reinsurance arbitration/litigation support as an expert witness and consultant
- Reinsurance system implementation assistance
- Internal control reviews –input processing and output controls
- Workers' Compensation premium audits and assistance in the development of audit procedures for workers' compensation client
- Annual Statement, Schedule F and recoverable reviews
- Underwriting and Claims reviews
- Reinsurance training and curriculum development
- Best practice review for reinsurance administration
- Reinsurance Adequacy Studies to ascertain if companies can withstand certain types of catastrophic events given their current reinsurance program
- Assistance to state insurance departments on examinations and training
- Environmental claims audits and exposure analysis
- Due diligence reviews
- Commutations analysis

**Examples of Projects:**

- Worked with clients in reinsurance, accounting, claims, reinsurance audits, and systems areas
- Work on Insurance Company Receiverships in the Reinsurance area

- Developed Regulatory Practice at prior Firm; developed and maintained relationships with insurance and reinsurance law firms, State Departments of Insurance and staff, Guaranty Fund Directors, and Receivers
- Helped develop Reinsurance Adequacy model to stress test company catastrophe survival: with and without Reinsurance for several Domestic Insurers
- Provided expert testimony in several litigated cases regarding reinsurance
- Worked on Environmental/Mass Tort Ground – Up Loss studies: Saved client several million dollars in claim reserves through our review
- Assisted client in Best Practice Review for Reinsurance Administration-reviewed and reported on all insurance functional areas that dealt with reinsurance and suggested process improvements and additional controls. Many suggestions were adopted by their Board of Directors
- Managed Interdisciplinary staff ranging from one or two professionals to over 20 for various projects

**Organizations:**

*Present*

- The International Association of Insurance Receivers (IAIR) – Member of Board of Directors, 2nd Vice President, Chair –Audit Committee; Co-Chair- Education Committee (See www.iair.org)

*Past*

- Associate Member of the Society of Financial Examiners (SOFE)

**Education:**

I attended Northern Illinois University in DeKalb, Illinois, the University of Illinois, Urbana Champaign and Roosevelt University in Chicago. I received my BA in Liberal Arts and Sciences with honors, and my Masters in Education (emphasis in Counseling Psychology) from the University of Illinois at Urbana–Champaign. I also earned my MSA, with honors, in Accounting and Business from Roosevelt University in Chicago.

**Expert Testimony:**

1988/89: ***Western Lloyds Insurance Co. (client) v .Guy Carpenter and Heileman and Justice (1989); Texas State Court.*** Issues: Misrepresentation in placement of reinsurance to a reinsurer (that became insolvent) for a cedent client by the two intermediaries. Testified on behalf of Western Lloyds on duties and functions of a reinsurance intermediary as well as those of a ceding company in monitoring its reinsurance.

MASON - 1108

2014:  ***North Carolina Rating Bureau hearing regarding revised dwelling fire and extended coverage insurance rates*[1]**:  Testified on November 3, 2014 at public hearing for the North Carolina Department of Insurance as their Reinsurance Expert regarding reinsurance matters related to the proposed increase of Homeowners rates.

**Expert Reports Prepared:**

1.  1990:  ***Various Plaintiffs v. First State Insurance Co. and New England Reinsurance Co. in Compagnie de Reassurance D'Ile de France v. New England Reinsurance Corp (NERCO)***:  Reinsurance dispute regarding facultative placement:  expert report and expert consulting. Expert report was written on behalf of Plaintiffs.

2.  **1997:  *United Parcel Service (UPS) v. Commissioner of Internal Revenue Service I reported on issues of Risk Transfer and fronting in Reinsurance***:  Expert report was written on behalf of Plaintiffs. Favorable Verdict, Federal Court. The case focused on the manner in which UPS decided to exit the excess value coverage business in 1984, creating a new, independent company known as Overseas Partners, Ltd.

3.  2004;  ***Camelot Services Inc.; Gateway Insurance Co.; Barry T. Cervantes v. Pacific Northwest Insurance LLC***:  Western District Court of Missouri–Central Division- Issues addressed were failure to finalize and secure reinsurance for a fronting agreement and to complete a multi-million dollar infusion of operating capital.

4.  2005:  ***Golden Eagle Insurance Co. and Mabee Estate v. Commissioner of Insurance***:  Review of Reinsurance accounting, reinsurance contracts and review of actuarial reports over a multiple year period on behalf of the Mabee Estate: Favorable verdict (Federal Court).

5.  2006-2007:  ***Meyer v. Converium Holding AG***:  Forensic Review of reinsurance, financial and reserve reporting, and misrepresentation of same against Converium Holding AG. (Federal Court).

6.  2015- For major U.S. carrier-2 cases–Issues regarding Risk Transfer in Reinsurance-expert report issued in one case

7.  ***Reciprocal of America in Liquidation v. PricewaterhouseCoopers***
    I worked on this case for the Receiver as a Reinsurance Accounting Expert for approximately 7 years-beginning in 2004.

---

[1] http://www.ncdoi.com/Media/Documents/12-19-14_HO_Order_Total.pdf.

MASON - 1109

**Insurance Work Experience:**

Evan D. Bennett LLC, Geneva, IL
Insurance and Reinsurance Consulting
Member - Manager
2012-present

Blackman Kallick, Chicago
(Merged with Plante Moran-July 1, 2012)
Director of Reinsurance Consulting
1995-1998 and July 2006 - November 2012

Brown Smith Wallace, Chicago
Principal, Insurance Practice, Reinsurance Consulting
2004-2006

Chiltington International, Chicago
Vice President- Reinsurance Consulting
2003-2004

Evan D. Bennett LLC, Chicago
Insurance and Reinsurance Consulting
Member - Manager
2001-2003

CSC Corporation, Chicago
Reinsurance Business Analyst/Consultant
2000-2001

Milliman & Robertson, Chicago
Reinsurance Consultant
1998-2000

Blackman Kallick, Chicago
Director of Reinsurance Consulting
1995-1998

Bennett Reinsurance Consultants, Chicago
President
1989-1995

Coopers & Lybrand, New York
Senior Consultant-Insurance and Reinsurance Practice
Actuarial Benefits and Compensation Group
1987-1989

MASON - 1110

Borg Warner Insurance Services, Chicago
Senior Internal Auditor, Manager- Reinsurance Audit
1983-1987

Combined Insurance Corporation, Northbrook, IL.
Reinsurance Accountant
1982-1983

**Teaching/Seminars/Speaking - Examples:**

**University of Wisconsin, Madison**
School of Business, Executive Education: various seminars-1985-2012:
> Reinsurance Management and Accounting-developed and taught
> Reinsurance: Advanced Concepts-developed and taught
> Financial Management for Non-Financial Insurance Executives:
> Reinsurance Overview

**International Center for Captive Insurance Education ("ICCIE"):**  Protecting the
Captive: Predicting Risk, Reinsurance and other Transfer Mechanisms, one of several on-
line courses to obtain the Associate in Captive Insurance ("ACI") designation-through the
University of Vermont;**2011-present**

**University of Connecticut School of Law- 2016-Present**
> Teach part of the Insurance Solvency Law and Regulation Course

**College of Insurance (St. John's University), New York**
> Reinsurance Consultant, Professional Programs
> Reinsurance Accounting and Auditing; Reinsurance Systems
> Reinsurance Claims (various programs nationwide) 1987-1991

**Brokers and Reinsurance Markets Association (BRMA)**
> NAIC Nine Month Rule: Retroactive Accounting, What Does It Look Like When
> It Has to be Applied?  1999

**Arizona Captive Society, "Reinsurance: Types of Agreements & Functions of
Intermediaries June** 3, 2011, Phoenix, AZ

**Mississippi State University**- "Insurance Day" Program April 2-3, 2013, speaker on
Reinsurance Issues and participated on "Mock" Arbitration Panel

**Dewey & LeBoeuf 2011 Runoff Symposium, New York, July 2011:** "Transferring Legacy Liabilities-New Methodologies and Techniques"

**Association of Insurance and Reinsurance Run-off Companies,** "AIRROC" panel discussion on Schedule F Issues, Chicago, June 2012

**Association of Insurance and Reinsurance Run-off Companies,** "AIRROC" panel discussion on Workers Comp Issues Impacting Reinsurance New York, July 2011

**Insurance Accounting and Systems Association (IASA):**

**IASA: Midwest Chapter**-Bloomington, Illinois, September 2007

**IASA: South Florida Chapter,** Fort Lauderdale, Florida
        Reinsurance Accounting and Reinsurance Issues. November 2007
        Auditing Third Parties in Reinsurance; November 2008,
        Reinsurance Issues, November 2010

**IASA: Carolinas Chapter:** Reinsurance Issues, August 2008

**IASA: Central States Regional Conference**-Chicago/Lisle Illinois,
        Reinsurance Issues, September, 2009

**International Association of Insurance Receivers (IAIR), April 2010,**
Miami, Florida, Reinsurance Audits in Insolvencies:
        What You Don't Know Will Hurt You! How Effective Reinsurance Audits Can
        Benefit Receivers

**IAIR-August, 2010,** Seattle, Washington, Panelist with **AirSP** at the **IAIR** Issues Forum on "Reinsurance Recoveries in a Changing Market"

**IAIR - January, 2011,** New Orleans, Louisiana,"2011 Insolvency Workshop-Peering Into IAIR's Crystal Ball, Moderator of Panel on "Business Development and Retention"

**IAIR - January, 2012,** San Diego, California, 2012 Insolvency Workshop-The Nuances and Perceptions between Receivers and the Guaranty Systems, Panel on "Reinsurance Rights, Reporting, Recoveries & Resolution"

**IAIR - January, 2015, Chicago, Illinois, Issues Forum on Understanding Reinsurance Treaties**

**IAIR - January, 2016, Amelia Island, Florida, Co Chairman, 2016Annual Insolvency Workshop**

**IAIR – October 14-16, 2020, Virtual Program, Co Chairman, Technical Development Series Workshop; Moderator -Reflections by Professional Receivers**

**Casualty Actuarial Society, Casualty Loss Reserve Seminar**, Disney's Contemporary Resort, Lake Buena Vista, Florida, September 2010,
> "Reserving for Individual Reinsurance Contracts"

**Society of Insurance Financial Management** - September 2006; Boca Raton, Florida,
> Issues in Reinsurance: Disclosure, Attestation and Risk Transfer

**Brown Smith Wallace LLC/Lord Bissell & Brook LLP;** 2005: "Reinsurance Audits - What you Don't Know Will Hurt You," April 21, 2005

**Environmental Claims Managers Association:**  Reinsurance Audit Relationships
> Reinsurer and Ceding Company Perspectives: 1996
> Using Technology in Environmental Exposure Analysis and Litigation Support, 1998

**Illinois CPA Society**, Chairperson, Co–Chairperson, speaker and/or task force member - Insurance and Reinsurance Conferences from 1996-2009.  Served as Chairperson of the Illinois CPA Society's Insurance Companies Special Interest Group from 2001-2006.

**Keynote Speaker on Risk Transfer/FASB 113**
> Reinsurance Education and Communication Hotline - REACH GROUP 1994

**Keynote Speaker on Environmental and Mass Tort Claims**
> A **Reinsurance Perspective** - REACH GROUP – 1997

**Keynote Speaker on Auditing Third Parties in Reinsurance** - REACH GROUP 2003

**Illinois Department of Insurance-Society of Financial Examiners (SOFE)**
> Auditing and Accounting for Reinsurance (Basic and Advanced) -Various seminars 1990-2009

**Illinois State University-** Prof. Insurance Agents, Advanced Commercial Lines School

**American Management Association-New York** Reinsurance Accounting 1988- 1989

MASON - 1113

**Executive Enterprises,** New York- Reinsurance Seminars, 1986, and 1987

**Institute for International Research** – Co-Chairperson, Traditional and Nontraditional Reinsurance Conference, Hamilton, Bermuda, 1991

**National Association of Insurance Commissioners** Reinsurance Conference-1991

**North Carolina Department of Insurance-1990**
    Reinsurance

**Texas** and **Wisconsin Departments of Insurance-2013 and 2011**
    Seminars for IAIR. Spoke on Reinsurance Issues in Receiverships

## Publications:

**"Auditing Reinsurance:  Good Faith Not Enough."** *National Underwriter* (1985)

**"Auditing the Reinsurance Function."** *Internal Auditing Journal* (1987)

**"Evaluating the Reinsurer for Collectability."** *Internal Auditing Journal* (1987)

**"Orders of Merit": The MGA Model Act.** *Reinsurance Magazine* (London) 3 part article (Co- Author) (1992)

**"Reinsurance Audits."** *Reinsurance Principles,* for the Associate in Reinsurance Course.  American Institute for CPCU's, Insurance Institute of America. (Co-Author) (1995)

**"Digging for Truth, Justice, and . . . Reinsurance Forensic Audits in Arbitration and Litigation."** *Mealey's Litigation Reports: Reinsurance* (1995)

**"Ignorance Is No Longer Bliss: A New Approach To The Quantification of Environmental and Asbestos Claims."** *Mealey's Litigation Report: Reinsurance* (Co-Author) (1997)

**"How to Set Up a Best - Practices Reinsurance Administration Program."** *The Edge, Insurance Edition,* Blackman, Kallick Bartelstein LLP publication; (Co-Author) (Fall, 2003)

**"Monitoring Reinsurance - A Behavioral View,"** *The Edge, Insurance* Edition, Blackman Kallick (Summer 2007)

**"Risk-Focused Exams for Reinsurance: What's Going On?"** *The Edge,* Insurance Edition, Blackman Kallick (November, 2009)

**"Getting Your Reinsurance Act Together:  Organizing Reinsurance in Receiverships and Troubled Companies or Protecting Your Largest Asset by Getting a Handle on it:  A Brief Checklist;"**

Kathleen M. McCain and Evan D. Bennett, presented at the International Association of Insurance Receivers Reinsurance Technical Development Series (June 10-11, 2011), published by the International Association of Insurance Receivers in the *Insurance Receiver, Summer 2011*

**"Equal Opportunity Offenders"** An Interview with Myron Picoult on Solvency Regulation, Past, Present and Future. Published by the International Association of Insurance Receivers, in the *Insurance Receiver, Summer 2012*         .

# ANNEX B

MASON - 1116

|  | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|
| Earned Premium | 2,730,820 | 16,540,785 | 30,788,090 | 41,042,664 |
| Ceded Premium | 1,470,128 | 3,746,547 | 6,926,027 | 6,293,895 |
| Net Premium | 1,260,692 | 12,794,237 | 23,862,063 | 34,748,769 |
|  |  |  |  |  |
| Policy Fees | 38,650 | 104,600 | 153,775 | 189,525 |
|  |  |  |  |  |
| **Total Revenue** | **1,299,342** | **12,898,837** | **24,015,838** | **34,938,294** |
|  |  |  |  |  |
| Loss Ratio | 63% | 60% | 56% | 64% |
| Incurred Losses | 787,932 | 7,634,823 | 13,358,060 | 22,070,724 |
|  |  |  |  |  |
| Comissions Expense | 531,094 | 3,243,121 | 6,060,721 | 8,064,728 |
| IT Expense | - | - | 51,336 | 61,755 |
| Professional Lines Salaries | 672,403 | 1,019,648 | 1,334,014 | 1,431,784 |
| Share Service Salary Allocation | 50,490 | 109,440 | 155,472 | 168,250 |
| Payroll Tax | 29,605 | 36,931 | 81,327 | 92,372 |
| Total Benefits | 36,310 | 42,755 | 38,848 | 52,253 |
| Travel and Entertainment | 43,478 | 44,649 | 67,681 | 66,065 |
| Rent | - | 65,321 | 97,069 | 131,159 |
| Recruiting Fees | - | - | - | 40,000 |
| **Total Expenses** | **1,363,380** | **4,561,865** | **7,886,468** | **10,108,365** |
|  |  |  |  |  |
| **Underwrting Profit** | **(851,971)** | **702,149** | **2,771,311** | **2,759,204** |
|  |  |  |  |  |
| **Earned Bonus (3%)** | **-** | **21,057** | **83,139** | **82,769** |
|  |  |  |  |  |
| **Actual Paid Bonus** | **52,500** | **107,500** | **132,500** | **82,769** |
|  |  |  |  |  |
|  |  |  |  |  |
| Acq Cost | 19.4% | 19.6% | 19.7% | 19.6% |
| IT allocation |  |  | 0.17% | 0.15% |

MASON - 1117

| 2018 |
| --- |
| 45,700,961 |
| 6,293,895 |
| 39,407,067 |
| |
| 214,825 |
| |
| 39,621,892 |
| |
| 85% |
| 33,465,781 |
| |
| 9,576,030 |
| 72,558 |
| 1,786,790 |
| 165,000 |
| 112,891 |
| 226,599 |
| 84,332 |
| 226,178 |
| 37,000 |
| 12,287,378 |
| |
| (6,131,268) |
| |
| - |
| |
| 25,000 |
| |
| |
| 21.0% |
| 0.16% |

# ANNEX C

MASON - 1119

10/30/2020

Calendar year data per Progish report of May. 2018. also using E & S Reducted AMTRUST REPORT as of 12-31-2018

| AmTrust and Mason | 2018 |
|---|---|
| **Gross written premiums per Gene Mason: Considered Fully Earned** | 50,000,000 |
| **Ceded Premium Gross-Estimated per AmTrust in prior spreadsheet Coding** | 6,293,895 |
| **Commission-Estimated per Gene Mason** | 1,718,899 |
| Net Ceded Premium | 4,312,068 |
| Net Written Premium - after Reinsurance | 45,657,212 |
| **Policy Fees - per AmTrust Prior Spreadsheet** | 214,825 |
| **Total Net Revenue** | 45,877,037 |

| | |
|---|---|
| Estimated Gross Total Incurred Loss | $4,000,000.00 |
| **RECOVERIES FOR '10' LARGE LOSSES - ESTIMATED ALLOCATION PER YEAR PER Gene Mason** | ($4,115,267.00) |
| less net of reinsurance | (115,267) |

**Hard Support for All Expenses listed by Amtrust**

| Commissions Expense (15% -20%) | 9,576,040 |
|---|---|
| IT Expense | 72,558 |
| Professional Lines Salaries | 3,366,750 |
| Share Service Salary Allocation | 185,000 |
| Payroll Tax | 112,891 |
| Total Benefits | 326,599 |
| Travel and Entertainment | 84,332 |
| Rent | 226,578 |
| Recruiting Fees | 37,000 |
| **Total Expenses** | 13,287,378 |

**Net Underwriting Profit**

| Estimated Net Underwriting Profit | 33,489,393 |
|---|---|

| | |
|---|---|
| Estimated Bonus due to Gene Mason | $3,004,082 |

**NOTES:  ESTIMATED IS ON THIS SPREADSHEET. ALL ARE SUBJECT TO CHANGE AS ADDITIONAL SUPPORT IS OBTAINED**

MASON - 1120