UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
EUGENE MASON,                           :
                                        :
                        Plaintiff,      :     19 Civ. 8364 (DLC)
                                        :
            -v-                         :     OPINION AND ORDER
                                        :
AMTRUST FINANCIAL SERVICES, INC. and    :
DAVIS LEWIS,                            :
                                        :
                        Defendants.     :
                                        :
----------------------------------------X

APPEARANCES:

For Plaintiff:
Richard Seth Meisner
Jardin Meisner & Susser, P.C.
30B Vreeland Rd., Ste. 201
Florham Park, NJ 07932
(973) 845-7640

For Defendant:
William Edward Vita
Westerman, Ball, Ederer, Miller & Sharfstein, LLP
1201 RXR Plaza
Uniondale, NY 11556
(516) 622-9200


DENISE COTE, District Judge:

     In September 2013, plaintiff Eugene Mason was hired by

defendant AmTrust Financial Services ("AmTrust") to create a

line of professional liability insurance.  AmTrust terminated

Mason's employment on July 17, 2019.  Trial is scheduled to

occur on January 2021 on Mason's claim against AmTrust for an

annual bonus for 2018 equal to three percent of net underwriting

income ("NUI") and for a 2018 discretionary bonus.  AmTrust
contends it does not owe any NUI bonus to Mason for 2018 because
AmTrust calculated the NUI for 2018 as a loss of over $6
million.

On November 20, 2020, AmTrust moved to exclude from trial
the testimony of Mason's damages expert, Evan D. Bennett, as
well as a monthly management report from May 2018 (the "May
Report") on which Bennett has relied.  For the reasons stated
below, Bennett's testimony is excluded.  AmTrust's motion to
exclude the May Report is therefore denied as moot.

## Background

AmTrust hired Mason as the Senior Vice President,
Professional Liability, in September 2013.  Mason signed an
offer of employment letter ("Letter") dated September 26, 2013.
The Letter provided that Mason would be eligible for two
bonuses: an annual bonus equal to three percent of NUI, and a
discretionary bonus.  AmTrust terminated Mason's employment on
July 17, 2019.

Mason filed this lawsuit against AmTrust on September 9,
2019.  An Opinion earlier this year granted a motion to dismiss
each of Mason's claims except for his breach of contract claim.
See Mason v. AmTrust Fin. Servs., Inc., No. 19CV8364 (DLC), 2020
WL 1330688 (S.D.N.Y. Mar. 23, 2020).  Mason's breach of contract
claim alleges that AmTrust breached the Letter by failing to pay

Mason underwriting and discretionary bonuses for the years 2014 through 2018.  A recent Opinion granted AmTrust summary judgment on the claims for 2014 through 2017, leaving only Mason's breach of contract claim for his 2018 bonuses.  See Mason v. AmTrust Fin. Servs., Inc., No. 19CV8364 (DLC), 2020 WL 6365448 (S.D.N.Y. Oct. 29, 2020).  These Opinions are incorporated by reference, and familiarity with them is assumed.

A bench trial on Mason's claim is scheduled to begin on January 6, 2021.  On November 20, AmTrust filed motions in limine to exclude Bennett's testimony at trial and to exclude the May Report upon which Bennett has relied.  A description of Bennett's expert report and the May Report follow.

I.   The Bennett Report

Bennett has been a consultant in the insurance and reinsurance industry for thirty-eight years.  He explains that he is an expert in reinsurance accounting and auditing.

Bennett calculates the AmTrust NUI for the calendar year of 2018 as over $33 million and the NUI bonus owed to Mason by AmTrust for 2018 as more than $1 million.  In contrast, AmTrust calculated the NUI for 2018 as a loss of over $6 million.  As a result, AmTrust determined that it owed Mason no NUI bonus for that year.

In making his calculations Bennett relied upon:

(1) the spreadsheet AmTrust used to calculate Mason's three percent bonus ("AmTrust Spreadsheet")[1];

(2) the May Report;

(3) an "excess and surplus lines" redacted document prepared by AmTrust, which lists information through December 31, 2018;

(4) numbers provided to him by Mason; and

(5) the Letter.

Bennett's report attaches a spreadsheet with his calculations ("Bennett Spreadsheet").  The following table sets out the columns in the AmTrust Spreadsheet and the Bennett Spreadsheet for the year 2018.[2]  The figures Bennett included in his Spreadsheet that were not present on the AmTrust Spreadsheet are in bold.

---

[1] AmTrust asserts that the data it provided to Bennett was audited and verified by a third-party public accounting firm.

[2] It is difficult to read all of the numbers on the copies of the Bennett Spreadsheet filed with this motion.  Therefore, the figure for ceded commission is the number that Bennett confirmed at his deposition.

| Calendar Year 2018 | AmTrust Spreadsheet | Bennett Spreadsheet and Report |
|---|---|---|
| Earned Premium[3] | $45,700,961 | **$50,000,000** |
| Ceded Premium | -($6,293,895) | -($6,293,895) |
| Policy Fees | +($214,825) | +($214,825) |
| [Ceded Commission] | N/A | **+($1,951,107)** |
| Total revenue | = $39,621,892 | = $45,872,037 |
| | | |
| Incurred Losses | -($33,465,781) | **-($4,000,000)** |
| Total Expenses | -($12,287,378) | -($12,287,378) |
| | | |
| [Reinsurance Recovery] | N/A | **+($4,115,267)** |
| | | |
| Underwriting Profit | = -$6,131,268 | = $33,469,393[4] |
| Earned Bonus (3% of underwriting profit) | = $0 | = $1,004,082 |

Bennett's notes at the bottom of his Spreadsheet state: "Above is for discussion purposes only, and no number on this sheet was verified/audited."[5]

As this table illustrates, Bennett changed two figures that appear in the AmTrust Spreadsheet.  The AmTrust Spreadsheet reports an earned premium figure of $45.7 million for 2018. Bennett uses $50 million as the earned premium for 2018.  Mason supplied this figure to Bennett.

---

[3] Bennett uses the term "gross written premium" to describe earned premium.

[4] Adding these numbers leads to an Underwriting Profit of $33,699,926.  Bennett's Spreadsheet lists a result of $33,469,393.

[5] The notes are illegible on the copies of the Bennett Spreadsheet filed with the parties' submissions.  This Opinion relies upon Bennett's recitation of the notes during his deposition.

Next, the AmTrust Spreadsheet reports an incurred loss of $33,465,781 for calendar year 2018. Bennett estimates an incurred loss of only $4 million for the calendar year 2018. Bennett explains that he did not use the AmTrust number because he was told AmTrust did not provide documentation to support its number. Instead, Bennett relied on the May Report, which he asserts shows only $54,855 of incurred loss as of May 2018. Bennett then made what he describes as a "conservative estimation" to arrive at his $4 million figure. Bennett's report does not provide the calculations he made in reaching his $4 million estimate of incurred loss or explain the process he used to make the estimate.

Bennett also adds two categories of figures that are absent from the AmTrust Spreadsheet. Bennett adds a category for a "ceding commission" to his calculations, using the figure of $1,951,107 that Mason provided to him. Bennett also adds as a credit $4,115,267 for ten large loss reinsurance recoveries, using the figure that Mason supplied to him.

II.  The May Report

Bennett's expert report relies on the May Report to estimate incurred loss. Bennett describes this document as a "Loss Run report" and as a "Monthly Management Report in the form of a spreadsheet" prepared by AmTrust and AmTrust's Vice President and senior claims manager, Paul Poppish and dated May

31, 2018.  The document contains forty-four pages with lines of

data and approximately seven to fifteen columns per page.

AmTrust represents that it did not produce the May Report during

discovery.

## **Discussion**

Federal Rule of Evidence 702 governs the admissibility of

expert testimony.  It provides:

> A witness who is qualified as an expert by knowledge,
> skill, experience, training, or education may testify in
> the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other
> specialized knowledge will help the trier of fact to
> understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and
> methods; and
>
> (d) the expert has reliably applied the principles and
> methods to the facts of the case.

Fed. R. Evid. 702.

The proponent of expert testimony bears the burden of

establishing its admissibility by a preponderance of the

evidence.  United States v. Williams, 506 F.3d 151, 160 (2d Cir.

2007).

Whether an expert is qualified in the area in which he or

she intends to testify is a "threshold question."  Nimely v.

City of New York, 414 F.3d 381, 396 n.11 (2d Cir. 2005).  "To

determine whether a witness qualifies as an expert, courts

compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." United States v. Tin Yat Chin, 371 F.3d 31, 40 (2d Cir. 2004).  A witness tendered on the basis of their experience "must show how his or her experience . . . led to his conclusion or provided a basis for his opinion." SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties, LLC, 467 F.3d 107, 132 (2d Cir. 2006) (citation omitted).

Additionally, an expert's testimony must be relevant, and it must rest on a reliable foundation. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993); In re Mirena IUS Levonorgestrel-Related Prod. Liab. Litig. (No. II), No. 19-2155, 2020 WL 7214264, at *2 (2d Cir. Dec. 8, 2020).  An expert's opinion is relevant if it will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; see Daubert, 509 U.S. at 591.  Expert testimony that invades the province of the fact finder, however, must be excluded.  United States v. Lumpkin, 192 F.3d 280, 289 (2d Cir. 1999).

An expert's opinion must have "a reliable basis in the knowledge and experience of his discipline." Daubert, 509 U.S. at 592.  A court should consider "the extent to which the expert's theory has been subjected to peer review and publication, whether the technique is subject to standards

controlling the technique's operation, the known or potential rate of error, and the degree of acceptance within the relevant scientific community." United States v. Ulbricht, 858 F.3d 71, 116 n.50 (2d Cir. 2017) (citation omitted).  The reliability assessment is "fluid and will necessarily vary from case to case." In re Mirena IUS Levonorgestrel-Related Prod. Liab. Litig. (No. II), No. 19-2155, 2020 WL 7214264, at *2 (2d Cir. Dec. 8, 2020).  "[W]hether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the [court] broad latitude to determine." Ulbricht, 858 F.3d at 116 n.50 (citation omitted).

A court must "assess whether the expert employs the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Restivo v. Hessemann, 846 F.3d 547, 577 (2d Cir. 2017) (citation omitted).  Expert testimony should be excluded if it is "based on data, a methodology, or studies that are simply inadequate to support the conclusions reached," or "if the opinion is speculative or conjectural . . . or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith[.]" United States v. Jones, 965 F.3d 149, 162 (2d Cir. 2020) (citation omitted).  Moreover, "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to

existing data only by the ipse dixit of the expert." <u>Gen. Elec.</u>
<u>Co. v. Joiner</u>, 522 U.S. 136, 146 (1997).

To be admissible, an expert's analysis must be reliable "at
every step." <u>Amorgianos v. Nat'l R.R. Passenger Corp.</u>, 303 F.3d
256, 267 (2d Cir. 2002). "[A]ny step that renders the analysis
unreliable . . . renders the expert's testimony inadmissible."
<u>Id</u>. (emphasis omitted). While a "minor flaw in an expert's
reasoning or a slight modification of an otherwise reliable
method will not render an expert's opinion <u>per se</u> inadmissible,"
the expert's testimony should be excluded "if the flaw is large
enough that the expert lacks good grounds for his or her
conclusions." <u>Id</u>. (citation omitted).

I.   Qualifications

AmTrust argues first that Bennett's testimony must be
excluded because Bennett is not qualified to render an expert
opinion on AmTrust's incurred loss for 2018. With one
noteworthy exception, in arriving at his opinion about the
amount of the bonus owed to Mason, Bennett performed simple
additions and subtractions that required limited expertise.
With the exception of the incurred loss figure, Bennett's NUI
calculation is based on figures taken from the AmTrust
Spreadsheet or figures given to him by Mason. Bennett's
extrapolation of incurred loss, however, was his own. It had
the effect of reducing the loss calculated by AmTrust from over

$33 million to just $4 million.  This single calculation was a game changer.  This roughly $29 million spread in incurred loss allowed Bennett to calculate a profit for AmTrust in 2018. While Mason also provided Bennett with figures reflecting roughly $10 million in additional revenue for AmTrust in 2018, without the $29 million reduction in losses, that additional Mason-supplied income would not have been sufficient to create the bonus that Bennett reports.

AmTrust contends that Mason is not qualified to perform an extrapolation of incurred losses.[6]  Incurred losses are established using several components.  These include "known claims" that a company has actually paid out to claimants, as well as "incurred-but-not-reported" claims ("IBNR").  Delta Holdings, Inc. v. Nat'l Distillers & Chem. Corp., 945 F.2d 1226, 1229 (2d Cir. 1991).  While known claim estimates "are less conjectural than IBNR reserves," "IBNR reserves are sums set aside to cover losses for which claims have not been reported but must be estimated so the company can pay future claims." Id.  As a result, calculating incurred losses requires an analysis of the insurer's reserves, the valuing of claims that

---

[6] If Mason was not permitted to rely on the May Report, which is the document from which he made his extrapolations, then his calculation of the bonus must be stricken for that separate reason.

have been incurred but for which the costs to the insurer have not been fully borne out, and an assessment of risk.  It is undisputed that the calculation of values for incurred losses in the insurance industry is a task performed by actuaries.[7]

Bennett is not qualified to provide an opinion on the incurred losses of AmTrust's professional liability unit, and his testimony on this matter must therefore be excluded. Bennett is not an actuary.  He has never provided actuarial services for an insurance company.  He does not purport to be familiar with the actuarial principles involved in calculating incurred losses figures.  Bennett does not have any knowledge, skill, experience, training, or education in the actuarial principles and methods that are used to calculate incurred losses.  He did not use actuarial methods or techniques when determining the incurred losses figure that he provided. Bennett acknowledged in his deposition that the $4 million incurred loss estimate that he provided was "a guess."

Mason argues that the issue of whether Bennett has the necessary credentials to perform the extrapolation of incurred loss goes to the weight of his testimony and not its

---

[7] Counsel for Mason admitted as much in a conference held on October 8, 2020.  At the conference, counsel explained that the NUI is "largely a function of accounting and actuarial loss reserves," and that calculating the NUI "requires . . . an accounting actuarial expert to review financial information in actuarial assumptions in order to give an opinion."

admissibility.  It is true that, if an expert witness is
sufficiently qualified to provide an admissible opinion, the
parties may explore and debate the expert's qualifications at
trial so that the fact-finder can take those qualifications, and
the limits of those qualifications, into account in assessing
what weight to give the opinion.  But a witness who is not
qualified to present an expert opinion must be excluded as a
trial witness.  Here, the complexity of an analysis of incurred
loss requires an actuary.  Without the necessary qualifications
to render the opinion he proffers, Bennett's testimony must be
excluded.  See, e.g., U.S. Bank Nat. Ass'n v. PHL Variable Life
Ins. Co., 112 F. Supp. 3d 122, 151-52 (S.D.N.Y. 2015) (expert on
insurance industry not permitted to testify on actuarial
matters).

II.  Reliability

    AmTrust argues that Bennett's opinions are insufficiently
reliable to meet the Daubert standards.  AmTrust contends that
Bennett's calculation of incurred loss is an inadmissible
estimate and the numbers provided to him by Mason are
unsupported.  Bennett's calculation must be excluded because
Mason has failed to show that Bennett's calculation of his bonus
rests on reliable numbers or methods of calculation.

    As explained above, without the radical reduction in
incurred loss from the AmTrust figure of over $33 million, the

Bennett calculation does not result in the bonus that Bennett reports.  Because Bennett applied no recognized method for arriving at his estimate of $4 million of incurred loss, his opinion must be stricken.  Bennett described no methodology in his expert report and admitted in his deposition that he had simply made a guess or an estimate.  The affidavit which constitutes his direct testimony does not fill this gap.  It also fails to describe any methodology, much less one recognized by the actuarial profession, that Bennett employed to arrive at the incurred loss figure in his calculation.

While not material to the calculation of a bonus without the extraordinary reduction in the incurred loss calculation, the other changes that Bennett made to the AmTrust Spreadsheet figures are similarly unreliable.  Mason provided these other figures to Bennett but has provided no explanation of their source or given any reason to believe that they rest on a reliable foundation.  A review of Mason's affidavit, which constitutes his direct testimony for the trial, does not explain how he calculated any of the numbers he provided to Bennett. Without a showing of reliability, these figures must also be stricken from Bennett's testimony.

## Conclusion

AmTrust's November 20 motion to exclude Mason's expert testimony is granted.  AmTrust's motion to exclude the May Report is denied as moot.


Dated:     New York, New York
           December 18, 2020


                              _____
                                     DENISE COTE
                         United States District Judge