UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
EUGENE MASON,                           :
                                        :
                         Plaintiff,     :      19 Civ. 8364 (DLC)
                                        :
              -v-                       :      OPINION AND ORDER
                                        :
AMTRUST FINANCIAL SERVICES, INC. and    :
DAVIS LEWIS,                            :
                                        :
                         Defendants.    :
                                        :
----------------------------------------X

APPEARANCES:

For Plaintiff:
Richard Seth Meisner
Jardin Meisner & Susser, P.C.
30B Vreeland Rd., Ste. 201
Florham Park, NJ 07932
(973) 845-7640

For Defendant:
William Edward Vita
Westerman, Ball, Ederer, Miller & Sharfstein, LLP
1201 RXR Plaza
Uniondale, NY 11556
(516) 622-9200


DENISE COTE, District Judge:

     This Opinion presents the Court's findings of fact and

conclusions of law following a bench trial on submission.  For

the reasons stated below, judgment is granted to defendant

AmTrust Financial Services ("AmTrust") on the sole remaining

claim, which is for breach of contract.

**<u>Procedural History</u>**

Plaintiff Eugene Mason ("Mason") commenced this action on September 9, 2019.  Two Opinions have narrowed the plaintiff's claims.  Mason's claims for recovery apart from his breach of contract claims were dismissed on March 23, 2020.  See <u>Mason v. AmTrust Fin. Servs., Inc.</u>, No. 19CV8364 (DLC), 2020 WL 1330688 (S.D.N.Y. Mar. 23, 2020).  Mason's breach of contract claims for any year but the last full year of his employment, which was 2018, were dismissed on October 9.  See <u>Mason v. AmTrust Fin. Servs., Inc.</u>, No. 19CV8364 (DLC), 2020 WL 6365448 (S.D.N.Y. Oct. 29, 2020).  Mason's remaining breach of contract claim consists of a claim for two unpaid bonuses: (a) a bonus of over $1 million based on 2018 Net Underwriting Income ("NUI"), and (b) close to $77,000 in restricted stock that were discretionary bonus awards due to vest after AmTrust terminated Mason's employment.

Following the conclusion of discovery, and in anticipation of a bench trial to be held on January 6, 2021, the parties filed on November 20, 2020 a pretrial order and their proposed findings of fact and conclusions of law.  In the pretrial order, Mason identified three witnesses for trial.  He also submitted declarations constituting his own direct trial testimony and the

trial testimony of his NUI expert Evan Bennett.[1]  As his third
witness, Mason disclosed an intention to subpoena former AmTrust
Vice-President Paul Poppish to testify regarding "accounting
information as to the profitability of AmTrust and the
calculation of bonuses."

On the same day, AmTrust filed a motion in limine to
exclude from trial the testimony of Mason's expert.  That motion
was granted in an Opinion with which familiarity is assumed.
See Mason v. AmTrust Fin. Servs., Inc., No. 19 CIV. 8364 (DLC),
2020 WL 7425254 (S.D.N.Y. Dec. 18, 2020) ("Daubert Opinion").

In a letter of December 21, AmTrust disclosed its intention
to move, pursuant to Federal Rule of Civil Procedure 52(c), for
judgment on Mason's claim for payment of an NUI bonus.  AmTrust
argued that Mason could no longer prove damages on his breach of
contract claim with respect to the NUI bonus because the Court
had excluded testimony from Mason's expert.

At the final pretrial conference, held on December 22,
plaintiff's counsel agreed that, in the absence of his expert's
testimony, Mason had no evidence regarding the amount of the NUI
bonus he was due for 2018.  Counsel for plaintiff explained that

---

[1] Pursuant to this Court's regular practice in non-jury
proceedings, and without objection by the parties, the direct
testimony of a witness under a party's control is to be
presented through declarations filed with the pretrial order.
In its letter of November 25, AmTrust waived its right to cross
examine Mason at trial.

the anticipated testimony from Poppish, who he had not yet subpoenaed for trial, would not fill that gap because Poppish would not be able to opine on the amount of NUI bonus AmTrust allegedly owed to Mason.  Plaintiff's counsel expected Poppish to testify only that AmTrust did not need to create an actuarial loss reserve for 2018.

At the conference, the parties also agreed that the plaintiff's claim for a discretionary bonus did not require a trial on January 6.  They agreed that Mason's right to such a bonus was a legal issue to be resolved on the basis of the construction of Mason's offer of employment letter ("Letter") and a set of annual equity agreements ("Equity Agreements") that Mason had signed each year he was given restricted stock as part of a discretionary bonus.  The parties also agreed upon the relevant documents to be received into evidence.  These include Mason's declaration representing his direct testimony and a chart that captures the calculation and cancellation of Mason's restricted stock awards.  The parties consented to a trial on submission and the cancellation of the January 6 trial.

## Background

The following constitutes the Court's findings of fact.  In September 2013, AmTrust hired Mason as Senior Vice President, Professional Liability Leader, to create a line of professional liability insurance.  Mason signed the Letter on September 26,

4

2013.  AmTrust terminated Mason's employment on July 17, 2019 for cause.

A. NUI Bonus

As explained in more detail in the <u>Daubert</u> Opinion, which is incorporated by reference, AmTrust was required to provide Mason with an annual bonus equal to three percent of NUI. AmTrust did not give Mason any NUI bonus for 2018, which was the last full year of his employment.  AmTrust calculated that no bonus was due since the unit lost over $6 million in 2018.

Mason's expert had concluded that AmTrust owed Mason over $1 million in an NUI bonus.  In calculating the unit's revenue, expenses and losses for 2018, Bennett relied on certain AmTrust figures, three revenue figures that he asserts Mason provided to him, and his own estimate of incurred loss that reduced the AmTrust calculation of incurred loss from approximately $33 million to $4 million.  With these adjustments, Bennett calculated a profit of $33.4 million, resulting in an NUI bonus for Mason of $1,004,082.

Mason has presented no support for the three revenue figures on which Bennett relied.  His declaration does not discuss these figures, identify any specific amount of revenue, or explain how he arrived at such numbers.  As explained in the <u>Daubert</u> Opinion, Bennett's estimate of incurred loss is inadmissible.

B. The Letter

The Letter provides that Mason would be eligible for two bonuses: a bonus equal to three percent of the annual NUI, and a discretionary bonus.  The discretionary bonus would "be determined at the sole discretion of Chief Executive Officer of [AmTrust], with no obligation of the Company to pay any discretionary bonus."  The Letter states that AmTrust could pay up to fifty percent of the discretionary bonus "in a combination of cash, options, restricted stock units, or other equity instruments of [AmTrust]."  Finally, the Letter states that bonuses "shall be paid in the year following the year in which the bonus is earned, provided that your employment with the Company has not terminated prior thereto."

C. Equity Agreements

Employees receiving discretionary bonuses in restricted stock were required to execute an Equity Agreement each year the employee received such a bonus.  The parties have submitted Equity Agreements signed by Mason for each year between 2014 and 2017.

AmTrust refers to awards of equity as Long-Term Incentives ("LTI") units.  The Equity Agreement grants such stock to the employee "subject to the vesting conditions" set forth in the Equity Agreement.  LTI units "vest in four equal installments of 25% on each of the first, second, third and fourth anniversaries

of the Grant Date, provided [the employee] remain[s] in Service
. . . on the vesting date."

Each Equity Agreement also contains forfeiture provisions.
The first forfeiture provision provides that, "[e]xcept as
specifically provided in this Agreement or as may be provided in
other agreements between you and the Company, no additional
[units] will vest after your Service has terminated for any
reason and you will forfeit to the Company all of the [units]
that have not yet vested[.]"  Additionally, each Equity
Agreement states that if an employee's service is terminated for
cause, the employee "shall immediately forfeit all rights to
[his or her] vested (but undelivered) and unvested [units] and
this award shall immediately terminate."

D. Mason's Discretionary Bonuses

Mason received both cash and LTI units as part of a
discretionary bonus award for each of the calendar years 2015,
2016, and 2017.  AmTrust typically granted LTI units to Mason
toward the middle of the following year.  Mason signed the
Equity Agreement for the 2017 LTI units on May 23, 2018.

Mason's last full year of employment with AmTrust was in
2018.  AmTrust awarded Mason a discretionary bonus for 2018 of
$25,000 in cash on June 28, 2019, but his employment was
terminated on July 17, 2019 before any LTI award to Mason for
his employment in 2018.

Following the termination of his employment, AmTrust cancelled Mason's LTI units that had not yet vested at the time his employment was terminated.  The chart below sets out Mason's LTI awards and the vesting schedules for the operative years of his breach of contract claim.  The units that AmTrust cancelled after it terminated Mason's employment are in bold.

| Bonus Year | Stock Issued | Vesting Schedule |
|---|---|---|
| 2015 | May 2016 | May 2017 - 514 units |
| | | May 2018 - 514 units |
| | | May 2019 - 514 units |
| | | **May 2020 - 513 units** |
| 2016 | May 2017 | May 2018 - 1,360 units |
| | | May 2019 - 1,360 units |
| | | **May 2020 - 1,360 units** |
| | | **May 2021 - 1,360 units** |
| 2017 | May 2018 | May 2019 - 653 units |
| | | **May 2020 - 653 units** |
| | | **May 2021 - 653 units** |
| | | **May 2022 - 652 units** |

In total, AmTrust cancelled 5,191 LTI units valued as of July 2019 at $14.75 per unit, for a total of $76,567.25.

## Discussion

### I. NUI Bonus

Mason contends that AmTrust owes him an annual bonus of over $1 million for the year 2018, which he contends is equal to three percent of NUI.  AmTrust has moved for judgment on partial findings on the issue of damages, pursuant to Rule 52(c).  AmTrust's motion is granted.

"If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that

issue, the court may enter judgment against the party on a claim
. . . that, under the controlling law, can be maintained or
defeated only with a favorable finding on that issue." Fed. R.
Civ. P. 52(c). The plaintiff bears the burden of proof as to
all elements of a breach of contract claim, including damages.
Terwilliger v. Terwilliger, 206 F.3d 240, 245-46 (2d Cir. 2000).

Mason has not presented admissible evidence that he is
entitled to an NUI bonus for the calendar year 2018. Mason
intended to rely on his damages expert for an estimation of
incurred losses that would dramatically reduce the incurred
losses calculated by AmTrust. That evidence was excluded in the
Daubert Opinion. Similarly, Mason has not offered any evidence
of the roughly $10 million in additional revenue that he
contends AmTrust omitted from its revenue calculations. Mason's
expert relied on revenue figures Mason provided to him, but
Mason's trial testimony, contained in his declaration, provides
no evidence regarding that revenue. As a result, Mason has not
established that he was damaged, much less by how much, due to
AmTrust's failure to pay him an NUI bonus for 2018.

II. Discretionary Bonus

Mason contends that AmTrust breached the Letter when it
cancelled his unvested LTI stock units after terminating his
employment. AmTrust contends Mason forfeited those rights at
the termination of his employment.

9

To prevail on a claim for breach of contract under New York law, a plaintiff must establish "(i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 114 (2d Cir. 2017) (citation omitted).[2] "A written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." Universal Instruments Corp. v. Micro Sys. Eng'g, Inc., 924 F.3d 32, 41 (2d Cir. 2019) (citation omitted). See also R/S Assocs. v. New York Job Dev. Auth., 98 N.Y.2d 29, 32 (2002). When multiple contracts are at issue, "all writings which form part of a single transaction and are designed to effectuate the same purpose must be read together, even [if] they were executed on different dates and were not all between the same parties." TVT Records v. Island Def Jam Music Grp., 412 F.3d 82, 89 (2d Cir. 2005) (citation omitted) (applying New York law).

"[A]n employee's entitlement to a bonus is governed by the terms of the employer's bonus plan." Kolchins v. Evolution Markets, Inc., 31 N.Y.3d 100, 109 (2018) (citation omitted). An employee's ongoing bonus payments are subject to forfeiture

---

[2] Both parties rely on New York law in their trial submissions. This "implied consent . . . is sufficient to establish choice of law." Alphonse Hotel Corp. v. Tran, 828 F.3d 146, 152 (2d Cir. 2016) (citation omitted).

after the termination of his or her employment where a bonus agreement "explicitly predicate[s] the continuation of bonus payments upon the recipient's continued employment status." Truelove v. Ne. Capital & Advisory, Inc., 95 N.Y.2d 220, 225 (2000).

A "course of dealing is a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting" the operative agreement. Restatement (Second) of Contracts § 223(1) (1981). "Course of dealing may become part of an agreement either by explicit provision or by tacit recognition . . . ." Id. at cmt. b. The course-of-dealing doctrine has been extended to "include evidence that a party has ratified terms by failing to object," provided there is "an indication of the common knowledge and understanding of the parties." New Moon Shipping Co. v. MAN B & W Diesel AG, 121 F.3d 24, 31 (2d Cir. 1997).

Mason has not proven that AmTrust breached its contractual obligations to Mason when it cancelled Mason's discretionary restricted stock awards scheduled to vest with Mason on dates that followed the termination of his employment. The Equity Agreements for Mason's bonus years 2015, 2016, and 2017 unequivocally state that "no additional [units] will vest after your Service has terminated for any reason and you will forfeit

to the Company all of the [units] that have not yet vested[.]"
(emphasis supplied).  Such contingent arrangements are
ubiquitous.  "Deferred awards of stock and stock options . . .
constitute incentive compensation, since they plainly serve the
function of giving employees an incentive to stay with the firm
and to maximize the value of the firm's business."  Guiry v.
Goldman, Sachs & Co., 814 N.Y.S.2d 617, 619 (1st Dept. 2006).

The Equity Agreements must be read together with the
Letter, as both pertain to payment of a discretionary bonus.
Under the plain language of the Letter, if AmTrust chose to pay
a discretionary bonus to Mason, it could pay a portion of that
bonus in "restricted stock units".  The Letter does not contain
a vesting schedule for the award of restricted stock units or
otherwise describe the restrictions that apply to such an award.
The Equity Agreements govern the terms and conditions of the
award of these restricted stock units.

Under the plain language of the forfeiture provision in the
Equity Agreements, AmTrust was permitted to cancel Mason's
unvested 5,191 LTI units after it terminated his employment.  As
a result, Mason has failed to show that he remains entitled to
those units or their equivalent in damages.

This construction of the Letter and the Equity Agreements
is confirmed by the parties' course of conduct.  For years,
Mason signed the Equity Agreements in connection with his

receipt of the restricted stock component of his bonus.  See New Moon Shipping Co., 121 F.3d at 31).  He has offered no evidence that he ever protested that the execution of the Equity Agreements was unnecessary or that he was entitled to any restricted stock units before the dates on which they were slated to vest.  Accordingly, AmTrust was entitled by the parties' agreements, confirmed by their course of conduct, to conclude that Mason had forfeited his right to unvested restricted stock when his employment ended.

Mason argues that the Letter supersedes the Equity Agreements and that the Letter required any discretionary bonus to be paid in full the year following that to which it pertained.  Mason points out that the forfeiture section of the Equity Agreements provided that an employee forfeited unvested units upon termination "[e]xcept as specifically provided in this Agreement or as may be provided in other agreements between you and the Company."  Mason argues that the Letter is another agreement between the parties and that it supersedes the Equity Agreements.  Because the Letter provides that it "shall be paid in the year following the year in which the bonus is earned", Mason contends that the Letter restricts AmTrust's ability to cancel the unvested units.  This argument fails.

The Letter and Equity Agreement must be read together to give full force and effect to each of their terms to the extent

13

possible.  Reading the documents as Mason does would ignore the
explicit and detailed forfeiture provisions in the Equity
Agreement.  Nothing in the Letter requires that construction.
In keeping with the Letter, the discretionary bonus was awarded
in the year following the year in which it was earned.  Part of
that award, however, was restricted stock.  The Letter
contemplated that restricted stock could be given as part of a
discretionary bonus.  The Equity Agreement governs the terms of
that award, which includes vesting of the stock over time and
forfeiture of unvested amounts following termination of
employment.

Finally, although it is unnecessary to reach this issue, it
should be noted that AmTrust argues that this entire claim is
time-barred.  AmTrust argues that Mason's claim based on the
cancellation of his unvested stock units is outside of the
limitations period contained in a 2016 agreement between the
parties that shortened the time period by which Mason could
bring claims against AmTrust.  That agreement required Mason to
bring claims "within six (6) months after the date of the action
or event that is the subject of [Mason's] lawsuit[.]"  Mason,
2020 WL 6365448, at *1.  Mason's discretionary bonus claim is
timely.  AmTrust cancelled the unvested stock after it
terminated Mason's employment in July 2019.  Mason brought this
lawsuit within six months of his termination from AmTrust.

<u>**CONCLUSION**</u>

The non-jury trial scheduled for January 6, 2021 is cancelled.  The Clerk of Court shall enter judgment for AmTrust and close this case.

Dated:    New York, New York
          December 28, 2020

_____
                DENISE COTE
         United States District Judge